Peyton Lee, OR SBN 164224
Assistant Federal Public Defender
Email: Peyton_Lee@fd.org
Michael Benson, AK Bar No. 1311070
Email: michael_benson@fd.org
Assistant Federal Public Defender
Fidel Cassino-DuCloux, GA SBN 40244
Federal Public Defender
Email: fidel_cassino-ducloux@fd.org
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARIE GERTRUDE JEAN VALMONT,<br><br>Defendant. | Case No. 3:24-cr-00353-AN-2<br><br>MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT AND VIOLATIONS OF *BRADY* AND DUE PROCESS<br><br>*Oral Argument Requested* |

# TABLE OF CONTENTS


Table of Authorites ..................................................... iii

INTRODUCTION ..................................................... 6

FACTUAL AND PROCEDURAL HISTORY ..................................................... 6

LAW AND ANALYSIS ..................................................... 14

I. The prosecution violated Due Process and *Brady* when it failed to timely disclose exculpatory evidence. ..................................................... 14

A. The evidence at issue is exculpatory. ..................................................... 17

B. The evidence was suppressed. ..................................................... 18

C. The delay constitutes prejudice for Ms. Valmont. ..................................................... 19

II. The government committed prosecutorial misconduct in interfering with Ms. Valmont's due process right to access witnesses and present a defense. ..................................................... 21

III. The Court should use its supervisory power to dismiss the indictment with prejudice. ..................................................... 24

A. The government's flagrant misconduct requires dismissal with prejudice. ..................................................... 24

B. There is not an appropriate lesser sanction absent dismissal with prejudice. ..................................................... 26

IV. Conclusion ..................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Benn v. Lambert*,
283 F.3d 1040 (9th Cir. 2002) ........ 18

*Brady v. Maryland*,
373 U.S. 83 (1963) ........ 6, 9, 14-21, 24-26

*Carriger v. Stewart*,
132 F.3d 463–80 (9th Cir. 1992) (en banc) ........ 15, 26

*Comstock v. Humphries*,
786 F.3d 701 (9th Cir. 2015) ........ 16, 17

*Edwards v. Ayers*,
542 F.3d 759 (9th Cir. 2008) ........ 16

*Goldberg v. United States*,
425 U.S. 94 (1976) ........ 15

*Gregory v. United States*,
369 F.2d 185 (D.C. Cir. 1966) ........ 22

*Kyles v. Whitley*,
514 U.S. 419 (1995) ........ 7, 15, 25-26

*Mooney v. Holohan*,
294 U.S. 103 (1935) (per curiam) ........ 15

*Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ........ 21, 22

*Strickler v. Greene*,
527 U.S. 263–82 (1999) ........ 16

*United States v. Agurs*,
427 U.S. 97 (1976) ........ 14

*United States v. Alvarez*,
86 F.3d 901 (9th Cir. 1996) ........ 15

*United States v. Bagley*,
473 U.S. 667 (1985) ........ 14

*United States v. Black*,
767 F.2d 1334 (9th Cir. 1985) ........................................ 21, 22

*United States v. Bohn*,
622 F.3d 1129 (9th Cir. 2010) ........................................ 22

*United States v. Bundy*,
968 F.3d 1019 (9th Cir. 2020) ........................................ 16, 18, 24, 26

*United States v. Chapman*,
524 F.3d 1073 (9th Cir. 2008) ........................................ 24, 26

*United States v. Chestang*,
849 F.2d 528 (11th Cir. 1988) ........................................ 15

*United States v. Cloud*,
102 F.4th 968 (9th Cir. 2024) ........................................ 16, 17, 19

*United States v. Cook*,
608 F.2d 1175 (9th Cir. 1979) ........................................ 21

*United States v. Hanna*,
55 F.3d 1456 (9th Cir. 1995) ........................................ 15

*United States v. Harris*,
543 F.2d 1247 (9th Cir. 1976) ........................................ 15

*United States v. Juan*,
704 F.3d 1137 (9th Cir. 2013) ........................................ 21, 22

*United States v. Lopez*,
4 F.3d 1455–64 (9th Cir. 1993) ........................................ 24

*United States v. Morrison*,
518 F. Supp. 917–19 (S.D.N.Y. 1981) ........................................20

*United States v. Olsen*,
704 F.3d 1172 (9th Cir. 2013) ........................................ 7

*United States v. Owen*,
580 F.2d 365 (9th Cir. 1978) ........................................ 24

*United States v. Pasha*,
797 F.3d 1122 (D.C. Cir. 2015) ........................................ 20

*United States v. Price*,
566 F.3d 900 (9th Cir. 2009) ........................................ 18, 19

*United States v. Rich*,
580 F.2d 929 (9th Cir. 1978) .................... 22

*United States v. Simpson*,
927 F.2d 1088 (9th Cir. 1991) .................... 24

*United States v. Struckman*,
611 F.3d 560–78 (9th Cir. 2010) .................... 26

*United States v. Well*,
572 F.2d 1383 (9th Cir. 1978) .................... 15

*Webb v. Texas*,
409 U.S. 95 (1972) .................... 21

**RULES**

Model Rules of Pro. Conduct R. 3.8(d) (Am. Bar Ass'n 2020) .................... 17

Fed. R. Crim. P. Rule 5(f) .................... 6

## INTRODUCTION

Defendant, Marie Gertrude Jean Valmont, through her attorneys, Peyton Lee, Michael Benson, and Fidel Cassino-DuCloux, respectfully moves the Court to dismiss the superseding indictment with prejudice. The government has failed to disclose exculpatory and impeachment evidence and has interfered with the defense's access to witnesses, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), this Court's Disclosure Order entered at arraignment, and Ms. Valmont's Fifth and Sixth Amendment rights to due process, compulsory process, and the right to present a complete defense.

## FACTUAL AND PROCEDURAL HISTORY

On September 17, 2024, the government indicted Ms. Valmont on seven counts relating to forced labor (Conspiracy to Commit Forced Labor, Forced Labor, and Benefitting from Forced Labor) and one forfeiture allegation. ECF 1. On September 27, 2024, the Honorable Jeff Armistead issued a Brady Disclosure Order pursuant to Rule 5(f) of the Federal Rules of Criminal Procedure and *Brady*, as well as its Supreme Court and Ninth Circuit progeny, that the government must produce to the defendant "in a timely manner" all such information or evidence "relating to guilt or punishment that might reasonably be considered favorable to the defendant's case, even if the evidence is not admissible[.]" ECF 15 at 1. The Order further provided that "[doubt] should be resolved in favor of the defendant with full disclosure being made" and that failures to comply with such an order could result in a variety of sanctions, including, but not limited to, dismissal of charges. *Id.* On November 22, 2024, the defense filed a request for discovery with the Court, outlining general requests as well as highlighting the prosecution's responsibilities and duties under *Brady* and its progeny, including the "duty to learn of any

favorable evidence known to the others acting on the government's behalf in the case, including the police." ECF 35 at 1 (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

After three motions to continue (one of which was filed jointly with the government), the case was scheduled to proceed to trial on May 11, 2026.[1] On January 21, 2026, the government filed a superseding indictment. ECF 52. The superseding indictment maintained four forced-labor counts (Conspiracy to Commit Forced Labor and Forced Labor), added document-servitude charges against Ms. Valmont, and added five healthcare-fraud charges against both defendants (Conspiracy to Commit Healthcare Fraud and False Statements Regarding Healthcare Fraud).[2] The government communicated at that time that the discovery already disclosed provided the basis for the new charges.[3] At the time of arraignment on the superseding indictment, on January 26, 2026, the trial date of May 11, 2026 was maintained. ECF 60. The defense filed an unopposed motion to continue the trial date on January 29, 2026. ECF 62.

At the time the government filed the superseding indictment, it had provided the defense with nine volumes of discovery. In addition to the email communications regarding completed discovery, the government stated in its responses to the defense's motions for a bill of particulars (ECF 71 & 76), that it had provided the pertinent discovery related to the new charges. ECF 74

[1] The trial was originally scheduled pursuant to a defense motion to continue for May 4, 2026. ECF 48. Due to a calendaring conflict, the Court reset that trial date by one week to May 11, 2026. ECF 59.

[2] As to the False Statements regarding Healthcare Fraud charges, Ms. Valmont is charged only for Count 10 while Ms. Andre alone is charged for Counts 9, 11, and 12.

[3] Email from Government, January 21, 2026: "These charges do not involve any new discovery and instead are supported by evidence that has already been disclosed to you." Exhibit B.

[filed 3/6/2026] at 2–3 ("The government has provided nine volumes of discovery, including DHS documents and records relating to the charges in this case that were produced in January and May of 2025. No additional discovery was disclosed to either of the defendants in connection with the added charges. The superseding indictment was based on evidence already disclosed to and known to defendants."); ECF 78 [filed 5/28/2026] at 6 ("the full discovery provided by the government in this case 'obviates the need for a bill of particulars.'"). The last volume of discovery received by defense, the referenced Volume 9, had been provided on December 17, 2025. Exhibit A, Cover Letter.

On May 21, 2026, the defense filed a motion requesting a final discovery deadline be scheduled by the Court. ECF 77. The government opposed the request and represented that the government "has, and continues, to fulfill its discovery obligations" and therefore a deadline was "unnecessary[.]" ECF 83 [filed 6/12/2026] at 1–2.

In fact, the government had been withholding substantial materials that had been in its possession since October 2025. The defense received Volume 10 of discovery on June 24, 2026 (Exhibit C, Cover Letter), Volume 11 of discovery on August 14, 2026 (Exhibit D, Cover Letter), and Volume 12 of discovery on September 21, 2026 (Exhibit E, Cover Letter). The government has stated that documentation of any specific records from the phones that the government intends to use are still forthcoming,[4] as is formal discovery of some of the affidavits and warrants in support of a search of the phones (these have been disclosed informally through email as of September 22, 2026).

---

[4] Transcript for Hearing, September 2, 2026, at 17–19. Exhibit F. Full extractions of the phones have been provided.

The contents of Volumes 10 and 11 are particularly striking. In October of 2025, the government, including AUSA Eliza Rodriguez, Lead Case Agent FBI Task Force Officer Yonsoo Lee, and Trial Attorney Elizabeth Hutson of the DOJ Civil Rights Division, conducted thirteen interviews with witnesses including DHS employees, licensors and compliance specialists who monitored the care home, Aging and People with Disabilities (APD) licensors and agents, and MV1's social worker/school counselor. Those interviews were audio recorded, totaling nearly eleven hours. Not only had none of the audio recordings been previously disclosed to the defense, but for eight of the interviews the defense had not received any reports disclosing or referring to the fact that such interviews had been conducted or the content of those interviews. All of the interviews had occurred months before Volume 9 of discovery was provided to the defense in December, months before the grand jury that returned the superseding indictment in January, months before the scheduled trial in May, and months before the government affirmatively represented in its responses to the request for a bill of particulars that it had provided complete discovery related to the charges.

The delays in disclosure have been pervasive and did not begin with Volumes 10 and 11. As referenced in the defense motion to set deadlines, other FBI 302 reports were not disclosed until a year or two after the relevant interviews or investigation. ECF 77 at 4–5.

Not only the timing, but also the content of the interviews is notable. They contain exculpatory and *Brady* material, including investigative leads for exculpatory witnesses, impeachment material about government witnesses, and evidence and statements inconsistent with the government's theory of the charges. In addition, they document misconduct by the government in its effort to influence witnesses and to avoid obtaining further information that may be exculpatory.

One witness explicitly disclosed that she had been previously put on a "*Brady*" list in Washington County. Exhibit G, ANDRE_10469 at 3:08. Following her disclosure, it was made clear by Lead Case Agent Yonsoo Lee that he was already aware of that matter. *Id*. at 38:40–38:57 (Agent Lee: "she's *Giglio* impaired . . . . [S]ince I'm Washington County Major Crimes, I'm familiar with that case[.]"). Those materials have still not been received by the defense, and the lead agent and AUSA discouraged the witness from providing documentation (the complaint) from her federal lawsuit related to those allegations. *Id.* at 36:49.

In another interview, the School Counselor for MV1 identified an additional possible witness who might provide important information regarding MV1's failure to disclose any allegations of abuse or neglect during the relevant period of the case. Exhibit H, ANDRE_10470 at 36:17–36:54, 40:31. The government and lead case agent again discouraged the witness from providing the name or further identification of such a witness. *Id.* at 40:53 (Trial Attorney Hutson: "[T]hen a lot of people are gonna know where she goes to therapy, and I think I would rather not know.").[5] These discussions were not incorporated or referenced in the 302 that case agent Lee wrote regarding the interview. *See* Exhibit I, ANDRE_10570–75.

That the government's approach is not accidental is confirmed by another recording, in which Case Agent Lee and AUSA Rodriguez discuss how certain evidence is not in their possession, but that the defense has been trying to make it the government's "responsibility to proactively go find [evidence]," and then they both state "no." Exhibit J, ANDRE_10474 at 24:46–25:08. AUSA Rodriguez called the defense's expectation that the government must

[5] The significance of this evidence has been further briefed in the defense's filings at ECF 90 and 103 and is the subject of a defense requested subpoena.

proactively investigate and produce evidence for the defense "bullshit." *Id.* at 25:09.

The government and lead case agent also disparaged the defense team and investigators to witnesses. Case Agent Lee stated to a DHS witness, in reference to the attorneys appointed to represent the defendants, "sometimes people will be less than forthcoming. They'll play little shady games about, you know, who they represent[.]" Exhibit K, ANDRE_10464, LNS Court Reporting Transcript, at 70. AUSA Rodriguez followed up, also referring to the defense team, and stated that "if someone approaches you and they say they're from the PD or they're a government attorney they can still be her defense attorney, because sometimes that's what they say," and continued: "sometimes they're kind of shady with who they are, because they want you to talk to them, right? But you don't have to talk to them if you don't want to." *Id.* at 72. These discussions were not incorporated or referenced in the 302 that case agent Lee wrote regarding the interview. *See* Exhibit L, ANDRE_10552 (describing only that she had "asked about the purpose of the interviews . . . she and her co-workers were concerned if the purpose of the government's investigation had anything to do with [Yolandita's] civil suit . . . [and the] Interviewing agent explained that the government's purpose for interviewing the licensors was solely as witnesses to human trafficking investigation into, and charges against Yolandita and Marie.").

The 302 reports regarding those interviews raise further concerns. None of the reports disclose that Lead Case Agent Yonsoo Lee was audio recording the interviews. Other 302 reports have been received for interviews that the defense has not received audio recordings from. It is now unclear whether that is because they were not recorded or simply that the reports do not reflect that they were recorded and the government has failed to produce the audio. With

regards to timing, the reports are largely "drafted" on the interview dates in October 2025, despite most reports not being provided to the defense until June of 2026.

The interviews also contained critical exculpatory information regarding the DHS allegations against Ms. Valmont, much of which is not reflected in the 302 reports. A comparison of the recordings with the corresponding 302 reports shows that the lead investigative agent omitted important, defense-friendly details in his write-up of the interviews. Some of that information is described above (failing to include that the School Counselor identified a further witness working with MV1 at the time of the allegations, failing to include that the government and lead agent had discouraged a witness from talking to defense investigators and attorneys by describing them as "shady" and implying they are less credentialed than the government).

In an additional example, a 302 report of the interview of one DHS employee fails to include the fact that a family member at the Velida care home was upset about the license suspension because the family member believed Ms. Valmont and Ms. Andre were doing a great job. *Compare* Exhibit M, ANDRE_10465 at 57:16 (regarding the suspension process: "That angry family member thought that they were fantastic") *with* Exhibit N, ANDRE_10560 (302 report, omitting any reference).

In another interview, case agent Lee writes in his report that a DHS employee discussed exceptional payments being abused as a "rate supplement," "instead of actually being used to hire additional caregivers." Exhibit O, ANDRE_9688. What the DHS employee actually said in the audio recording is that "the Medicaid rates are too low, and so . . . they really struggle . . . I say rate supplement, it's really, . . . just for them to keep their doors open." Exhibit P,

ANDRE_10463 at 18:18. Also not included in the 302 report, she stated that 90 to 95 percent of foster care homes are not legally employing individuals in their care homes and are paying people under the table, and that “a lot of them are just really, like, closely knit family type situations where it's, you know, children, cousins, friends, family, you know, and that’s like, ‘Well, come work for me, and I'll fix your car or something.’” *Id.* at 19:14–20:02. This description is precisely the kind of family dynamic and arrangement that Ms. Valmont and Ms. Andre have put forth as a defense and yet was notably omitted from the reported account of the interview.

The audio recordings of the interviews with DHS employees appear to have been made by case agent Lee. Yet, no report documents exactly how these recordings were made outside of stating that they were “recorded using a government issued digital recorder.” Exhibit Q, ANDRE_13297. The recordings do not all begin at the start of the interviews and at no point is there an identifying statement at the start of the recordings about the fact of recording, the date, or other typical introductory comments. As a result, it is unclear if the recordings were accidentally or purposefully made as part of the investigation of this case, or if the individuals involved were all aware of the recordings or were aware that they would eventually be disclosed to defense counsel. In addition, the recordings are noticeably shorter than the length of the Microsoft Teams meetings which they purport to record, based on the timestamps contained in

Volume 12 of discovery.[6] This is particularly concerning when the 302 Reports already omit important material contained in the recorded portions of the interviews.

## LAW AND ANALYSIS

### I. The prosecution violated Due Process and *Brady* when it failed to timely disclose exculpatory evidence.

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Court subsequently held that the "duty to disclose such evidence is applicable even though there has been no request by the accused." *United States v. Agurs*, 427 U.S. 97, 107 (1976). The government's disclosure obligations encompass impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

[6] Chart comparing the length of Teams Meetings from ANDRE_13303-16 (Microsoft Teams Meeting Chats, with timestamps) to the length of audio from ANDRE_10461-10474 (audio recordings of interviews).

| Interviewee | Teams Duration | Audio Duration | Difference |
|---|---|---|---|
| Tracy Applegate Hassan | 1:05:40 | 1:00:36 | 0:05:04 |
| Alicia Bilbao | 0:30:22 | 0:25:27 | 0:04:55 |
| Carmen Morales Arnbrister | 1:01:45 | 0:55:53 | 0:05:52 |
| Erin Drake | 1:15:57 | 0:41:02 | 0:34:55 |
| Gita Reddy | 1:23:25 | 1:11:43 | 0:11:42 |
| Jennifer Lawrence | 1:04:39 | 1:00:59 | 0:03:40 |
| Julia Killen | 1:06:14 | 0:51:11 | 0:15:03 |
| Kizzie Newton | 0:44:43 | 0:34:38 | 0:10:05 |
| Melissa Canning | 0:57:46 | 0:39:15 | 0:18:31 |
| Nancy Avila | 1:08:11 | 0:59:11 | 0:09:00 |
| Jeanette Curtis | 0:59:33 | 0:45:20 | 0:14:13 |
| Zoe Clark | 0:46:48 | 0:28:01 | 0:18:47 |

Moreover, under *Brady v. Maryland*, “the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in the case[.]” *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Hanna*, 55 F.3d 1456, 1461 (9th Cir. 1995) (same); *see United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996) (“better practice is for the prosecutor herself to review [surveillance notes for Brady material]”).

Such disclosures include the work of the involved agents. The prosecution “has a duty to learn of exculpatory evidence” known to any government agents “[b]ecause the prosecution is in a unique position to obtain information known to other agents of the government” and is not “excused from disclosing what it does not know but could have learned.” *Carriger v. Stewart*, 132 F.3d 463, 479–80 (9th Cir. 1992) (en banc); *see also United States v. Harris*, 543 F.2d 1247, 1253 (9th Cir. 1976) (rough notes of interviews, especially with the accused, are discoverable and must be preserved); *Goldberg v. United States*, 425 U.S. 94, 98 (1976) (“a writing prepared by a Government lawyer relating to the subject matter of the testimony of a Government witness that has been ‘signed or otherwise adopted or approved’ by the Government witness is producible under the Jencks Act”); *United States v. Well*, 572 F.2d 1383, 1384 (9th Cir. 1978) (tape recordings of interviews).

The government has a continuing duty to disclose the foregoing evidence as soon as the government or any of its agents discovers its existence. *See Mooney v. Holohan*, 294 U.S. 103, 108 (1935) (per curiam) (prosecutor must disclose that witness had committed perjury even when he first learns this at trial); *United States v. Chestang*, 849 F.2d 528, 532 (11th Cir. 1988) (continuing duty to disclose breached when prosecutor did not disclose fact that witness would soon accept immunity offer).

There are three elements to establish a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The appropriate "test for pretrial disclosure of exculpatory evidence" is "whether the evidence is favorable to the defense." *United States v. Cloud,* 102 F.4th 968, 979 (9th Cir. 2024) (internal quotation marks omitted). "[T]o the extent that the prosecution doubt[s] 'the usefulness of the evidence,' the government 'should resolve such doubts in favor of full disclosure.'" *United States v. Bundy*, 968 F.3d 1019, 1040 (9th Cir. 2020) (internal citations omitted). The "materiality standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials." *Cloud*, 102 F.4th at 979.

"Evidence is suppressed where it is known to the state and not disclosed to the defendant." *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015); *see also Edwards v. Ayers*, 542 F.3d 759, 768 (9th Cir. 2008) ("Suppression by the prosecution, whether willful or inadvertent, of evidence favorable to the accused and material to either guilt or punishment violates the Constitution.").

Separately from the constitutional *Brady* standard, this Court's Disclosure Order provided at arraignment was not limited to *material* evidence. Rather, it required disclosure of "*all* information or evidence known to the government relating to guilt or punishment that might reasonably be considered favorable to the defendant's case[.]" ECF 15 at 1 (emphasis added). The ABA Model Rules impose a parallel duty: "The prosecutor in a criminal case shall . . . (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that

tends to negate the guilt of the accused or mitigates the offense." Model Rules of Pro. Conduct R. 3.8(d) (Am. Bar Ass'n 2020).

**A. The evidence at issue is exculpatory.**

Evidence is favorable to the accused if it is either exculpatory or impeaching. *Cloud*, 102 F.4th at 979. "If information would be advantageous to the defendant, or would tend to call the government's case into doubt, it is favorable." *Comstock*, 786 F.3d at 708. Importantly, evidence is favorable and exculpatory however slight its probative value. "[W]hether evidence is favorable is a question of substance, not degree, and evidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is by definition favorable." *Id.*

"[T]he retrospective definition of materiality is appropriate only in the context of appellate review," and "trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial." *Cloud*, 102 F.4th at 979 (quoting *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013)).

"Whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here. Rather, the materiality inquiry should evaluate the relative value of the withheld evidence on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." *Cloud*, 102 F.4th at 980.[7]

Here, the evidence suppressed by the government was both exculpatory and impeaching material. The disclosure that a DHS witness had previously been *Brady* listed was patently impeachment material. Additionally, a DHS employee's statements that the exceptional care

[7] In the *Brady* context, prejudice and materiality are interchangeable terms. *Cloud*, 102 F.4th at 980.

payments were generally used to keep businesses afloat and that many supervised foster care homes rely on informal funding of their employees are exculpatory as to Ms. Valmont's pending charges. Finally, the identification of a therapist to whom MV1 was speaking, and to whom she made no disclosures, was clear exculpatory evidence: a potentially essential witness to impeach the forced-labor allegations.

**B. The evidence was suppressed.**

Delayed disclosure of critical evidence constitutes suppression of *Brady* evidence. "The term 'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor . . . omission[s] are equally within Brady's scope." *United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009); *see Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) ("[T]he terms 'suppression,' 'withholding,' and 'failure to disclose' have the same meaning for Brady purposes."). "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. "As a matter of law, the prosecution is deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant." *Bundy*, 968 F.3d at 1037 (internal quotation marks and citation omitted).

Here, the significant delay constituted suppression: law enforcement learned of critical exculpatory evidence during its investigation, with the United States Attorney's Office aware and present, and the government did not timely disclose it. Interviews were conducted October 20-23, 2025, with the government present; Volume 9 was produced December 17, 2025, without any audio recordings and missing eight of the relevant 302 reports; the superseding indictment was filed January 21, 2026; the bill-of-particulars responses on March 6, and May 28, 2026, each

asserted complete discovery; and Volume 10 was then finally produced on June 24, 2026, with Volume 11 coming August 14, 2026.

**C. The delay constitutes prejudice for Ms. Valmont.**

The final factor in the *Brady* analysis asks whether the failure to disclose the exculpatory evidence was prejudicial. *Price*, 566 F.3d at 911. Here, the government's *Brady* violations are not only flagrant; they have prejudiced Ms. Valmont. The government may argue there is no prejudice because the defense learned of the suppressed evidence prior to trial. The government made that very argument in its response (ECF 83) to the defense's motion to set a deadline (ECF 77), contending that because seven months remained before trial, the disclosures left the defense "enough time for it to be of value in preparing their defense." ECF 83 at 7. The Ninth Circuit rejected that argument in *Cloud*, which involved impeachment evidence discovered before the witness testified at trial, declining to entertain the slippery-slope argument that prejudice was lacking:

> [T]he Government asks us to create a perverse rule: that it cannot be sanctioned for withholding impeachment evidence about a critical witness whose testimony could have been determinative of guilt or innocence, simply because the district court caught its misconduct *too early.* This argument, if taken to its logical extreme, could risk preventing a trial judge from imposing *any* forward-looking *Brady* sanction under the rationale that there can be no due process violation unless and until the court permits the government's concealment of evidence to fatally taint the trial's result. Our precedents, however, foreclose that argument.

*Cloud,* 102 F.4th at 981. Accordingly, such an argument must be rejected, and the government should be held to account for failing to produce the *Brady* material and its other prosecutorial misconduct.

Importantly, the *Brady* material the government failed to disclose is only available before trial because the defendants moved to continue the case. The government did not request a

continuance because it needed more time to comply with its disclosure obligations. Instead, it affirmatively represented that discovery was complete, and that the new charges were based solely on information that had already been provided. Consequently, when Ms. Valmont weighed the decision of whether or not to continue the trial and waive her speedy trial rights, she did so without being able to consider the *Brady* material that had not been provided. In fact, she had to weigh that decision relying on the government's representation that no additional material existed.

Delay in disclosure in itself constitutes "'very real prejudice' because memories fade in eight months and the defense [has] lost the opportunity to get a fresher recollection on the record." *United States v. Pasha*, 797 F.3d 1122, 1127 (D.C. Cir. 2015). Similarly, eight months passed here before the defense learned of these interviews. The risk of faded memories has fundamentally prejudiced Ms. Valmont. Furthermore, the government can now strengthen its case at Ms. Valmont's expense. Raising this *Brady* issue requires the defense to show its strategy and set forth the legal and factual particulars of Ms. Valmont's case. The prosecution can use this information to its advantage at trial.

By way of illustration, in the context of the harder standard of pre-indictment delay under the Fifth Amendment Due Process Clause, courts have found sufficient prejudice to warrant dismissal where the delay has resulted in faded witness memories, lost evidence, and other impairments to presenting a complete defense:

- *United States v. Morrison*, 518 F. Supp. 917, 918–19 (S.D.N.Y. 1981) (dismissing a prison-assault indictment after a six-month delay where the government failed to interview or keep a list of incarcerated witnesses).
- Order, *United States v. Johnson*, No. 84-4-RE (D. Or. Feb. 25, 1985) (finding that delay in a bank-robbery indictment violated the Due Process Clause where the defendant's alibi

defense was prejudiced by the faded memories of those with whom he worked at the time of the robbery).

The *Brady* violation in this case is analogous because delaying disclosures of core interviews for nearly eight months hindered timely investigation and caused the same types of prejudice identified in the pre-indictment delay cases.

**II. The government committed prosecutorial misconduct in interfering with Ms. Valmont's due process right to access witnesses and present a defense.**

"At its core, the right to due process is the right to fairly 'present a defense.' Although a defendant's right to present a defense is not absolute, the Supreme Court has recognized that the government may not substantially interfere with the testimony of defense witnesses." *United States v. Juan*, 704 F.3d 1137, 1141 (9th Cir. 2013) (internal citations omitted). Conduct that discourages or prevents witnesses from speaking with defense counsel can therefore violate due process: "absent a fairly compelling justification, the government may not interfere with defense access to witnesses." *United States v. Black*, 767 F.2d 1334, 1337 (9th Cir. 1985). A person's due process rights are violated when misconduct "effectively dr[ives a] witness off the stand." *Park v. Thompson*, 851 F.3d 910, 919 (9th Cir. 2017) (citing *Webb v. Texas*, 409 U.S. 95, 98 (1972)). Coercive or intimidating language or tactics by prosecutors or law enforcement officers can also constitute "substantial interference" with a witness's choice to testify. *Park*, 851 F.3d at 919.

Both the prosecution and defense have the right to interview witnesses before trial. *Black*, 767 F.2d at 1337 (citing *United States v. Cook*, 608 F.2d 1175, 1180 (9th Cir. 1979)). However, witnesses also have the right to refuse to speak or be interviewed. *Black*, 767 F.2d at 1338. Thus, there is a clear difference between providing proper, neutral information regarding rights and

improper, coercive interference with a witness. The Ninth Circuit has held that "it is imperative that prosecutors and other officials maintain a posture of *strict neutrality* when advising witnesses of their duties and rights. Their role as public servants and as protectors of the integrity of the judicial process permits nothing less." *United States v. Rich*, 580 F.2d 929, 934 (9th Cir. 1978) (emphasis added).

Thus, simply informing a witness that she may decline an interview, or that she need not speak to defense attorneys if she does not wish to, is permissible; so too is "a letter to prospective witnesses stating they ha[ve] no obligation to speak with defense attorneys[.]" *Black*, 767 F.2d at 1338. It is when the government goes beyond a neutral explanation of a witness's rights that it can violate due process. *Black* relies on *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966), where "the prosecutor advised the witnesses not to talk to anyone *unless he was present*. The court held that such advice effectively denied defense counsel access to witnesses except in the presence of the prosecutor, and consequently denied the defendant a fair trial." *Black*, 767 F.2d at 1337–38. It does not matter whether the witness is the prosecution's or the defense's, because "regardless of whose witness is interfered with, the constitutional harm to the defendant is the same—the inability to mount a fair and complete defense." *Juan*, 704 F.3d at 1142.

"Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying." *United States v. Bohn*, 622 F.3d 1129, 1138 (9th Cir. 2010). In *Park*, the detective contacted the witness and told her that her ex-boyfriend (who had been abusive and who Park believed was the killer) was upset with the witness. The court held that the detective's statements "constitute thinly veiled threats" that the ex-boyfriend might retaliate if she testified for *Park*. The detective

also told the witness that the defense team would lie and encouraged her not to believe them and asserted that the ex-boyfriend was innocent and that *Park* was the killer. *Park*, 851 F.3d at 920–21.

In this case, the government initially made the correct statement of law to the witness. AUSA Rodriguez gave a preliminary neutral advisement ("I and Yonsoo cannot direct you who you can talk to and who you can't . . . You don't have to talk to them unless you get a subpoena from the Court to show up to trial."). ANDRE_10464, LNS Court Reporting Transcript, at 70. However, such statements were immediately undermined and poisoned by remarks about the case agent's "Tigard PD badge and . . . FBI badge," with the attendant implication that defense investigators and counsel lack comparable authority, and that the defense engages in "shady" games to try to hide who they are and obtain statements from the witness. *Id*. at 71–72. TFO Lee also encouraged the witness to contact him directly with any "question about who somebody is," and AUSA Rodriguez added that "if anyone was going to talk to you that wasn't Yonsoo, we would tell you." *Id.* at 70–71. When the government indicated that "shady" defense attorneys might pretend to be working for the government, it implicitly suggested that it would be a *bad idea* to talk to defense attorneys. The thrust of the conversation was that the witness should be vigilant to make sure that the person they talk to is an upstanding FBI agent rather than dissimulating defense investigators. Such statements and discouragements go beyond the permissible neutral statements of a right not to speak with defense counsel or investigators and improperly infringed on Ms. Valmont's constitutional right to access witnesses.

**III. The Court should use its supervisory power to dismiss the indictment with prejudice.**

A court may use "supervisory power to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations before a jury; and to deter future illegal conduct." *United States v. Chapman*, 524 F.3d 1073, 1086 (9th Cir. 2008) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)) (internal quotation marks omitted). *See also United States v. Lopez*, 4 F.3d 1455, 1463–64 (9th Cir. 1993) (stating federal courts are empowered to deal with "threats to the integrity of the judicial process"); *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) (finding dismissal can be used as a tool to discourage future deliberate prosecutorial impropriety). A court may dismiss an indictment with prejudice for a *Brady* violation where it finds "(1) flagrant misbehavior and (2) substantial prejudice." *Bundy*, 968 F.3d at 1031 (internal quotation and citation omitted). Both factors are present here.

**A. The government's flagrant misconduct requires dismissal with prejudice.**

The evidence suppressed by the government included exculpatory information that the government was obligated to timely turn over to the defense. The government's late disclosure, repeated resistance to obtaining additional exculpatory information, and witness interference rise to the level of flagrant misbehavior because of its reckless disregard for its constitutional obligations. *See Chapman*, 524 F.3d at 1085 (explaining that flagrant misbehavior embraces reckless disregard for the prosecution's constitutional obligations). The Ninth Circuit has recognized that prosecutors need not act intentionally when engaging in flagrant misbehavior. *See, e.g.*, *id.* at 1080 (finding the prosecution's untimely disclosures to be flagrant misconduct where the prosecution had 22 months to provide discovery in a complex case involving over

400,000 pages of documents); *Bundy*, 968 F.3d at 1041 (finding that the prosecution's withholding of documents amounted to reckless disregard of its obligations). Here, the evidence was so clearly exculpatory that reasonable minds could not differ on the need for disclosure; one witness explicitly disclosed that she was on the *Brady* list, another witness specifically responded to a question about what further witnesses might be important to talk to, and another explained precisely the form of financial arrangement that constitutes the defense in this case.

Here, the untimely disclosures were pervasive and more than a simple oversight. After all, both prosecutors were present at the October 2025 interviews. For more than seven months afterward, they continued to represent that all evidence related to the pending charges had been disclosed. That delay included a period during which the defense could have chosen to proceed to trial in May 2026, completely unaware that it was missing significant exculpatory materials from the government. The government has not provided an explanation for the delay, but regardless of the reason, the government engaged in flagrant misconduct by not disclosing the exculpatory evidence for more than seven months, and not until after the defense asked the Court to set final discovery deadlines—a request the government continued to resist.

As to the content of the conduct, the government has gone beyond simply failing to provide exculpatory material and has also affirmatively interfered with Ms. Valmont's access to the relevant witnesses in this case. The representations to witnesses about the "shady" games the defense plays reflect a flagrant disregard for due process and cannot be permitted.

It is also notable that the government avoided learning exculpatory information offered by a variety of witnesses. The government scoffs at the Supreme Court's holding that it has an affirmative duty to learn of evidence favorable to the defendant. *See Kyles*, 514 U.S. at 437 ("the

individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing *what it does not know but what it could have learned."*) (emphasis added).

**B. There is not an appropriate lesser sanction absent dismissal with prejudice.**

A lesser sanction is not available when it "will put the defense at a greater disadvantage than it would have faced had the government produced the *Brady* material in the first place – thereby perpetuating the harm from a violation of a federal constitutional right." *Bundy*, 968 F.3d at 1043 (citing *United States v. Struckman*, 611 F.3d 560, 577–78 (9th Cir. 2010)). Here, nothing will restore Ms. Valmont to the position that a prompt disclosure of the materials at the appropriate time would have provided; the witnesses were interviewed eleven months ago without defense access, memories that the defense might have captured or questioned have declined, and the defense has now had to lay out in detail the nature of the defense and the manner that the material would be exculpatory in a way which would not have been required had proper disclosures occurred.

"There is also the related need to impose a sanction that will serve to deter future prosecutions from engaging in the same misconduct." *Bundy*, 968 F.3d at 1044. Further, when considering dismissal, the court assesses the prosecution's willfulness in committing the conduct and willingness to accept responsibility. *Chapman*, 524 F.3d at 1087. Dismissal with prejudice is the appropriate sanction. Here, there is an interest in imposing a sanction that will deter future misconduct because the government's lack of explanation for the late disclosures and its active

participation in the violations suggest that it does not appreciate the seriousness of its conduct. The complete failure to accept responsibility and the repeated insistence on full compliance with its discovery obligations further exacerbate the concerns and justifies a sanction in the form of dismissal.

## IV. Conclusion

For the foregoing reasons, the Court should dismiss the superseding indictment against Ms. Valmont with prejudice.

Dated: September 23, 2026.

*/s/ Peyton Lee*
Peyton Lee, OR SBN 164224

*/s/ Michael Benson*
Michael Benson, AK Bar No.1311070

*/s/ Fidel Cassino-DuCloux*
Fidel Cassino-DuCloux, GA SBN 40244