SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**ARIN C. HEINZ, MISB #P80252**
Assistant United States Attorney
Arin.Heinz@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000

**ELIZABETH HUTSON, VAB #85763**
Trial Attorney
Human Rights and Special Prosecutions Section
U.S. Department of Justice, Criminal Division
1301 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 532-5578
Elizabeth.Hutson@usdoj.gov
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**YOLANDITA ANDRE and**
**MARIE GERTRUDE JEAN VALMONT,**

**Defendants.**

**Case No. 3:24-cr-00353-AN**

**GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT AND VIOLATIONS OF *BRADY* AND DUE PROCESS (ECF 111)**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

RELEVANT FACTS ..................................................................................................2

ARGUMENT ..........................................................................................................18

A. There Was No *Brady* Violation Because The Information Was Disclosed Nearly Seven Months Before Trial ..........................................................................18

B. The Recorded Interviews Were Disclosed Well Before Trial And In Enough Time For The Defense To Make Effective Use Of Them ..........................................19

C. There Was No Prosecutorial Interference With Witnesses ..................................23

CONCLUSION .......................................................................................................28

## TABLE OF AUTHORITIES

### Cases

*Brady v. Maryland*, 373 U.S. 83 (1963) .................... *passim*

*Giglio v. United States*, 405 U.S. 150 (1972) .................... 11, 20, 23, 24, 29

*Park v. Thompson*, 851 F.3d 910 (9th Cir. 2017) .................... 24, 25

*Strickler v. Greene*, 527 U.S. 263 (1999) .................... 18, 21

*United States v. Agurs*, 427 U.S. 97 (1976) .................... 18

*United States v. Alahmedalabdaloklah,* 94 F.4th 782 (9th Cir. 2024 .................... 20, 22

*United States v. Barroso,* 719 Fed. Appx. 936, *4 (11th Cir. 2018) .................... 27

*United States v. Bruce*, 984 F.3d 884 (9th Cir. 2021) .................... 18, 21

*United States v. Cadet,* 727 F.2d 1453 (9th Cir. 1984) .................... 19

*United States v. Davenport,* 753 F.2d 1460 (9th Cir. 1985) .................... 20

*United States v. Davis,* 974 F.2d 182 (D.C. Cir. 1992) .................... 26

*United States v. Fernandez,* 231 F.3d 1240 (9th Cir. 2000) .................... 20

*United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) .................... 20, 22

*United States v. Jacobs*, 855 F.2d 652 (9th Cir. 1988) .................... 23

*United States v. Jaeger*, 538 F.3d 1227 (9th Cir. 2008) .................... 23

*United States v. Jones,* 612 F.2d 453 (9th Cir. 1979) .................... 18, 20

*United States v. Juan*, 704 F.3d 1137 (9th Cir. 2013) .................... 23, 24, 26

*United States v. Kuyoro,* 175 F. 4th 630 (5th Cir. 2026) .................... 23

*United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993) .................... 23

*United States v. Lord*, 711 F.2d 887 (9th Cir. 1983) .................... 24

*United States v. Mills,* 641 F.2d 785 (9th Cir. 1981) .......... 19

*United States v. Riley*, 189 F.3d 802 (9th Cir. 1999) .......... 14

*United States v. Shelton*, 588 F.2d 1242 (9th Cir. 1978) .......... 22

*United States v. Stinson*, 647 F.3d 1196 (9th Cir. 2011) ..........

*United States v. Terragna*, 390 F. App'x 631 (9th Cir. 2010) .......... 15

*United States v. Vavages*, 151 F.3d 1185, 1189 (9th Cir. 1998) .......... 24

*United States v. Yandell,* No. 2:19-cr-00107-KJM*,* 2023 WL 2071282 (E.D. Cal. February 16, 2023) .......... 18

*Webb v. Texas*, 409 U.S. 95, 97-98 (1972) *(per curiam)* .......... 23, 24

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) .......... 26

**Statutes**

18 U.S.C. § 2 .......... 4,5

18 U.S.C. § 1035 .......... 5

18 U.S.C. § 1349 .......... 5

18 U.S.C. § 1589 .......... 4, 5

18 U.S.C. § 1592 .......... 5

18 U.S.C. § 1594 .......... 4,5

18 U.S.C. § 3500 .......... 15, 18-21

**Rules**

Fed. R. Crim. P. 16 .......... 18

## I. INTRODUCTION

This case involves an extensive investigation into Defendants' forced labor and healthcare fraud in operating a local adult foster care home ("Velida's"). As the Government produced volumes of discovery to the defense, it continued to investigate Defendants' fraudulent scheme by interviewing numerous witnesses who worked for the State of Oregon. The Government produced reports of those interviews as soon as the agent generated them; what was unclear to the prosecutors at that time was that the case agent also recorded those interviews. Once they learned of the recordings, they promptly produced those, too.

Under the rules governing production of witness statements, all these items were timely produced well before this Court's discovery deadline and well before required under applicable federal law, as explained more fully below. Nevertheless, the Government acknowledges and concedes two points made in Defendants' motion.

First, when it produced the witness reports without also referencing the recordings, it left the defense with the mistaken impression that it had all the information surrounding those witness interviews. This piecemeal production was neither ideal nor intended; it was, however, a mistake that was corrected months before the current trial date of January 11, 2027.

Second, during one interview with a state employee, the Government told the witness (correctly) that she could be approached by the Defense and that it would be up to her whether she decided to meet with them to discuss the case. While attempting to differentiate the federal criminal case from other, unrelated civil litigation, the Government suggested that the Defense might use "shady" tactics. That characterization, premised on another witnesses expressed confusion, was unfair. It was; however, an isolated comment not shared with any other witness.

Neither of these points justify the extraordinary relief the Defense seeks with this motion of an outright dismissal of the charges. Instead, the Defense seeks to capitalize on these mistakes, urges the Court to ignore the Government's self-corrections, and award the Defense with a get-out-of-jail free card. For the reasons explained below, the Defense's motion should be denied, and the case should proceed to trial.

## II. RELEVANT FACTS

1. On September 17, 2024, a federal grand jury returned an Indictment against the Defendants charging them with Conspiracy to Commit Forced Labor, in violation of 18 U.S.C. §§ 1589(a) and 1594(b) (Count 1); Forced Labor, in violation of 18 U.S.C. §§ 1589(a) and 2 (Counts 2-4); and Benefitting from Forced Labor, in violation of 18 U.S.C. § 1589(b) (Counts 5-7). ECF 1. Defendants were arraigned on September 27, 2024, and ordered released on conditions. ECF 14, 18-19.

2. On December 10, 2024, FBI Task Force Officer (TFO) Yonsoo Lee received a phone call from Billy Marc because he was upset and concerned about his safety. Gov't Ex. 2 (TFO Lee's Report_BATES 10536). Marc explained to TFO Lee that when he was at work, unknown individuals came to his residence looking for him. *Id*. Marc's cousin (hereinafter referred to as Adult Witness 1 or AW1) – who did not want to be identified to TFO Lee due to safety concerns –interacted with the individuals since Marc was not at home. *Id.* AW1 reported to TFO Lee that "based on his contact with these two people, he developed the belief that these people were government investigators working with the FBI on the investigation." *Id.* So, he scheduled a meeting between the individuals and Marc. *Id.* At the meeting, Marc learned that the individuals AW1 interacted with were investigators working for the defense, which caused him "extreme anxiety" due to his fear of the Defendants. *Id.*

3. Marc called TFO Lee asking for guidance. TFO Lee advised him that he could not give legal advice and it was his choice whether he spoke with them; he also advised that the defense investigators were professionals who did not pose him any physical harm. *Id.* Marc later informed TFO Lee that he agreed to briefly speak with the investigators. *Id*. AW1 told TFO Lee that "he [AW1] was led to believe that the parties were government investigators working with the FBI. He explained that he would not have confirmed [Marc's] whereabouts or coordinated the meeting if he had known they worked for [the Defendants]." *Id.* at 2.

4. Approximately 15 months after the initial indictment, on January 21, 2026, a federal grand jury returned a Superseding Indictment against the Defendants charging them with Conspiracy to Commit Forced Labor, in violation of 18 U.S.C. § 1594(b) (Count 1); Forced Labor, in violation of 18 U.S.C. §§ 2, 1589(a), and 1589(b) (Counts 2-4); Document Servitude, in violation of 18. U.S.C. § 1592(a) (Counts 5-7); Conspiracy to Commit Healthcare Fraud, in violation of 18 U.S.C. § 1349 (Count 8); and False Statements Regarding Healthcare Fraud, in violation of 18U.S.C. § 1035 (Counts 9-12). Defendants were arraigned on these charges on January 26, 2026, and remained out of custody on conditions. ECF 60.

5. The discovery in this case is voluminous. As detailed in the Government's filing at ECF 83, the Government first produced discovery to defense counsel on October 11, 2024, within two weeks of the first arraignment. ECF 83 (Government's Response to Defendant Valmont's Motion to Set Deadline for Pretrial Documentation and Disclosure of Investigation and Discovery) at 2. The Government continued to provide discovery obtained during the pendency of the case to Defense counsel on a rolling basis, as further detailed below. To date, 14 Volumes have been produced to defense counsel totaling over 13,441 pages of discovery. This

discovery also includes numerous hours of interviews conducted with prospective witnesses during the ongoing Government investigation.

6. In late 2024, the Government sent subpoenas to Oregon DHS for any and all documents pertaining to Velida's Care Home. Additionally, Defense counsel requested that the Government send additional subpoenas to Oregon DHS for records pertaining to any Adult Protective Services Investigations and full CPS and DHS investigations pertaining to MV1. As a result, the Government received "narratives"[1] of the interactions that took place between ODHS Adult Foster Care personnel and Velida's home care.[2] This included reports and notes from many staff members at ODHS – including what they observed while they were in Velida's, conversations that they had with the Defendants, billing information, and requests made by Defendants such as for Medicaid exemptions. All this evidence was disclosed to the Defense in Volumes 3, 4, and 6 on January 6, 2025, and May 13, 2025. Additionally, the Government received Adult Protective Services (APS) investigative files, such as the one that was compiled by Melissa Manning.[3] The supporting evidence for each potential witness is outlined further below in a chart.

7. Between October 20, 2025, and October 22, 2025, TFO Lee, AUSA Eliza Carmen Rodriguez, and Trial Attorney Elizabeth Hutson interviewed 12 witnesses from the Oregon

---

[1] The narratives referred to are essentially reports that each witness wrote when they had an interaction with the Defendants at Velida's. The narratives name each witness and therefore reasonably put defense on notice of each witness and their potential relevance in January 2025, as further detailed below.

[2] An partial narrative was provided in Volume 3 on January 6, 2025, in Bates Numbers ANDRE_.0000783 – ANDRE_0000808. A full and complete narrative containing the ODHS interactions with Defendants from application to suspension was provided in Volume 4 on January 25, 2025, in Bates Numbers ANDRE_0001166 – ANDRE_0001240.

[3] This complete APS investigative file was provided in Volume 3 on January 25, 2025.

Department of Human Services (ODHS) via Microsoft Teams. Def. Ex. Q_0013296. All these potential witnesses, and any of their notes and statements, either were referenced in the narrative or in the APS investigative files that had been received from ODHS and provided to Defense in January 2025. Each day consisted of multiple back-to-back interviews. The purpose of the interviews was to prepare for the trial, which was scheduled for May 2026, after the Government received documentary evidence from ODHS in late 2024 and early 2025. Though these potential witnesses had relevant information to offer, their information is not nearly as central to the Government's case as the three trafficking victims named in the Superseding Indictment.[4] The Government expects to, at most, only call a handful of these witnesses at trial. For the interviews held over Microsoft Teams, TFO Lee recorded the substantive portions of the interviews of these 12 potential trial witnesses.[5] *Id*.

8. Accordingly, there are recordings for the following potential witnesses the Government interviewed: (1) Carmen Morales Arnbrister; (2) Tracy Hassan; (3) Jeanette Curtis; (4) Erin Drake; (5) Mackenzie Clark; (6) Nancy Avila; (7) Kizzie Newton;[6] (8) Jennifer Lawrence; (9) Gita Reddy; (10) Alicia Bilbao; (11) Melissa Canning; and (12) Julia Killen. Then, on October 23, 2025, TFO Yonsoo Lee, AUSA Eliza Carmen Rodriguez, and Trial

---

[4] AV1 and AV2 were initially interviewed on July 24, 2024, in a recorded interview. The recordings and the associated reports were provided in Volume 2, in Bates numbers ANDRE_0000735 – ANDRE_0000736 on November 15, 2024. A copy of MV1's recorded interview was given to the defense in person while they were reviewing physical evidence at the FBI on June 26, 2025, and again in Volume 9 in Bates Number ANDRE_009750 on December 17, 2025.

[5] TFO Lee did not record the interview of one witness – Ms. Valorie White – also a DHS employee who was interviewed in person, but he authored a report that was provided to Defense in Volume 10 on June 24, 2026.

[6] When TFO Lee was recording this witness interview the recorder's batteries died midway through. Thus, the interview recording is in two parts.

Attorney Elizabeth Hutson interviewed Ms. Naila Lundstrom from Tigard High School via Microsoft Teams. TFO Lee's report of Naila Lundstrom's interview, BATES numbers ANDRE_0010639 – ANDRE_0010644. TFO Lee also recorded this interview.

9. The recordings of the potential witnesses were produced in June 2026 because there was a miscommunication between TFO Lee and AUSA Carmen Rodriguez about the existence of the recordings. AUSA Carmen Rodriguez became aware of their existence in June 2026, and they were produced to Defense shortly thereafter.

10. The recordings and reports generated from the above-mentioned potential witness interviews were provided to Defense counsel as detailed below:

| **Witness** | **Date Report Provided** | **Date Recording Provided** | **Discovery Relevant to Witness/Provided by Witness (DHS Narratives, Photos, Correspondence, Etc.)** |
|---|---|---|---|
| Carmen Morales Arnbrister | Volume 9 – December 17, 2025 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Tracy Hassan | Volume 9 – December 17, 2025 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Jeannette Curtis | Volume 9 – December 17, 2025 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 2, 2025; Documents mentioned in report provided on December 17, 2025 |
| Erin Drake | Volume 9 – December 17, 2025 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Mackenzie Clark | Volume 9 – December 17, 2025 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Nancy Avila | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Kizzie Newton | Volume 10 – June 24, 2026 | Recording is in two parts due to technical error - provided in | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |

| Witness | Date Report Provided | Date Recording Provided | Discovery Relevant to Witness/Provided by Witness (DHS Narratives, Photos, Correspondence, Etc.) |
|---|---|---|---|
| | | Volume 10 – June 24, 2026 | |
| Jennifer Lawrence | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025; Correspondence provided on August 14, 2026 |
| Gita Reddy | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025; Photos provided on June 24, 2026 |
| Alicia Bilbao | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Melissa Canning | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Reports provided to Defense January 6, 2026; Correspondence provided on August 14, 2026 |
| Julia Killen | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Narrative – Volumes 3 and 4 – January 6 and 29, 2025 |
| Naila Lundstrom | Volume 10 – June 24, 2026 | Volume 10 – June 24, 2026 | Student conference profile and emails provided to defense on June 24, 2026 |

11. Upon Defendants' request, screenshots of the associated Microsoft Teams chats were provided to the Defense in Volume 12 of discovery on September 21, 2026. Gov't Ex. 1 (compiled Teams logs). These chats do not contain much substance and instead include things like Agent Lee sharing his contact information.

12. Microsoft Teams records the duration of the meeting from the time the first person joins the meeting until the time that the last person leaves the meeting. During any given interview, one individual may arrive to the meeting early – starting the Microsoft Teams clock. Occasionally, AUSA Carmen Rodriguez, Trial Attorney Hutson, and TFO Lee also discussed

matters after the witness left the meeting,[7] so the meeting time reflected on Microsoft Teams log was longer than the duration of the recording.[8] *See e.g.* Gov't Ex. 1 (compiled Teams logs).

13. For example, during the interview of Melissa Canning, further detailed below, when Ms. Canning stepped away for a moment to grab a pen, AUSA Carmen Rodriguez asked TFO Lee and Trial Attorney Hutson "do you guys wanna stick around for a minute after so I can catch you up?" Def. Ex. G at 35:35. After the interview concluded, it is evident from the recording that the Government had internal discussions about the case. Moreover, for a few of the interviews, the recording began after the initial introduction and did not include the conclusory remarks. For these reasons, the recordings are shorter than the time duration reflected on the Microsoft Teams log. Nonetheless, absent a technical glitch, the substantive information the witnesses provided was captured on the recordings or in the reports of that interview.

14. During these interviews, when the potential witnesses referenced documents that the Government did not possess, such as reports, photographs, or communications, the Government requested the potential witness provide it or indicated that the Government would subpoena it. For example, during the interview of Nalia Lundstrom, further detailed below, Lundstrom stated she exchanged emails with Defendant Andre. AUSA Carmen Rodriguez asked Lundstrom to provide the email correspondence to the Government. Def. Ex. H_BATES 10470 at 7:45-10:15. This was provided to Defense in discovery as detailed above in the chart.

---

[7] There are several instances where the witness left the conversation and TFO Lee inadvertently continued to record while conversations ensued between the attorneys and him about the case.

[8] Defendants point to these discrepancies to suggest that the differences are concerning (ECF 111 at 13-14); however, as detailed throughout this pleading, the substantive portions of the interviews were captured with the exception of one witness: Lizzie Newton. During that interview TFO Lee's recorder lost battery power, so he had to change out the batteries midway through.

15. The potential witnesses that Defendants focus their motion on will be further detailed below.

***Melissa Canning – Adult Protective Services Investigator***
**(Def. Ex. G_BATES0010469)**

16. The Government interviewed Melissa Canning on October 22, 2025. Gov't Ex. 2 (TFO Lee's Report). The recording of the interview is approximately 39 minutes long. Def. Ex. G_10469. The recording begins with introductions; AUSA Carmen Rodriguez can be heard asking her colleagues to introduce themselves. *Id*. After the introductory comments, Canning offered to "start from the beginning." *Id*. at 2:50. From there, Canning disclosed that while she was a law enforcement officer with Washington County, she filed a federal lawsuit against the County with whistleblower retaliation allegations. She indicated that part of the circumstances of the retaliation involved her being "*Brady* listed"[9] and that she subsequently received a sizeable settlement because she was wrongfully terminated. *Id*. at 3:15. Canning also informed the Government that the federal lawsuit is a publicly accessible document[10] and that the allegations therein did not relate to the Defendants. *Id.* at 4:12-4:15. Indeed, they occurred when she was in a prior job working for a different agency. *Id.* at 4:15-4:45. When Canning offered to provide the federal case number, AUSA Carmen Rodriguez responded that the information would be "really

---

[9] Canning indicated that there was extensive litigation and through "multiple testimonies" that the only reason she was *Brady* listed was because of retaliation. *Id.* at 3:40-4:05.

[10] Canning later elaborated that "if you google my name, that lawsuit pops up." *Id.* at 12:05-12:10. Indeed, a google search of the name "Melissa Canning" returns multiple links to sources of information, including the lawsuit she referenced. The Oregon Public Broadcasting network wrote an article entitled "'Salsa-gate' lawsuit at Washington County ends with $950,000 settlement for ex-deputy," and provides information about the circumstances that lead to Canning being placed on the *Brady* list. The Government pulled this information from the public docket and provided it to Defense on October 6, 2026. Moreover, the Government formally requested derogatory information related to Canning from the Washington County Sheriff's Office on September 11, 2026, and will comply with its continuing *Brady* and *Giglio* obligations.

helpful;" Trial Attorney Hutson agreed the information would facilitate their discussion. *Id*. at 4:40-5:10. Thereafter, Canning, for the next 30 minutes of the interview, detailed an interaction she had with the Defendants when she responded to Velida's due to a report that an elderly resident was tied up in her bedroom.

17. As the interview concluded, Canning again offered to provide the federal case number and complaint to the Government. *Id.* at 36:32. TFO Lee chimed in that she could "hold off for now" and they would "reach out if they need anything else." *Id*. at 36:35-37:01. Canning responded, "no problem, it's on Google anyway; just pop my name in there." *Id*. At 38:30 minutes into the interview, Canning signed off Microsoft Teams and the interview concluded. The recording continued for approximately 45 more seconds, while TFO Lee, AUSA Carmen Rodriguez and Trial Attorney Hutson discussed Canning's civil lawsuit. *Id.* 38:33-39:15. TFO Lee stated that he was "familiar with the case" and expressed that "it is what it is . . . the issue in the end whether she was right or wrong . . . like it's funny, I was shocked…" *Id.* The recording ends there as TFO Lee, AUSA Carmen Rodriguez and Trial Attorney Hutson had internal case discussions outside of the presence of the witness.

***Gita Reddy – Department of Human Services Complaint Specialist***
**(Def. Ex. K_BATES10464)**

18. The Government interviewed Ms. Gita Reddy on October 21, 2025. Gov't Ex. 3 (TFO Lee's Report). The recording of Ms. Reddy's interview is approximately 1 hour and eleven minutes long. Def. Ex. K_0010464. The substantive interactions with the witness were recorded, but the recording does not contain the initial introductory remarks or final conclusory remarks.

19. The recording of the interview begins with AUSA Carmen Rodriguez stating "--times that you went to the house [in reference Velida's] . . . which I think were only a couple of

times." Def. Ex. K_0010464 at 3. For approximately the next 50 minutes of the interview, Reddy described her observations from the multiple times she went to Velida's for DHS compliance checks. Def. Ex. K_0010464; Gov't Ex. 1 (TFO Lee Report). Throughout the interview, she referenced her DHS file, which included her reports and photos. The Government requested these documents and provided them to Defense counsel in Volume 10 on June 24. (ANDRE_0013000 – ANDRE_0013093).

20. After approximately 54 minutes into the interview, the attorneys indicated they did not have any additional questions and thanked Reddy for her time. Reddy, in response, asked if she was allowed to ask questions. *Id.* at 54. Reddy expressed confusion about the purpose of the interview – whether the interview was for the "state versus Yolandita" or whether it was "tied to her tort with [DHS]." *Id.* TFO Lee clarified that "this has nothing to do with her suing you. This is about the government of the United States prosecuting her for human trafficking." *Id*. Reddy responded that "we've (in reference to her DHS coworkers) been trying to figure out like, are you interviewing us to see if we would be subpoenaed on her behalf or are you interviewing us . . . on the State's side?" *Id.* TFO Lee and AUSA Carmen Rodriguez continued to clarify their respective roles, and the purpose of the meeting was to investigate federal trafficking charges. *Id.* at 54-58. This exchange ensued for several minutes. *Id.*; *see also* Def. Ex. K_0010464 at 54:17-57:27.

21. Reddy then asked, "I don't know if I'm allowed to ask this . . . is it Medicaid fraud too?" *Id.* at 59. AUSA Carmen Rodriguez clarified they were investigating that as well and welcomed any information Reddy may have related to that. *Id*. Reddy offered some information she had related to potential Medicaid fraud. *Id*. at 59-66. Thereafter, once again, Reddy re-

directed the conversation to the tort claim directed at the DHS licensure unit, seemingly still confused about the purpose of the interview. *Id.* at 69.

22. In response, TFO Lee and AUSA Carmen Rodriguez again sought to clarify the roles of the respective people involved in the ongoing criminal prosecution. In that vein, AUSA Carmen Rodriguez stated that the Defendants have a "defense team who [are] handling her case on her behalf . . . and they might reach out. And I and Yonsoo cannot direct you who you can talk to and who you can't, right? I can't tell you one way or the other whether you pick up the call. What I can tell you is you have a choice. You don't have to talk to them unless you get a subpoena from the court to show up to trial. But if they call, if you want to answer you can. If you don't want to, you don't have to." *Id*. at 70.

23. TFO Lee, sought to clarify that if there is a question about who someone is, because they might not be "forthcoming," and may "play little shady games about, you know, who they represent," that Reddy could ask TFO Lee to verify who the individual was. *Id*. at 71. AUSA Carmen Rodriguez later elaborated that "If someone approaches you and they say they're from the PD or they're a government attorney they can still be her defense attorney, because sometimes that's what they say . . . you can just say, well, you know, are you with the FBI? And then they'll have to tell you no. . . sometimes they're kind of shady with who they are, because they want you to talk to them, right? But you don't have to talk to them if you don't want to." *Id.* at 72.

24. The recording cuts off with AUSA Carmen Rodriguz thanking Reddy in an indication that the substantive portion of the interview was over; the remainder of the conclusory wrap up was not recorded.

25. The Microsoft meeting log shows the meeting lasted 1 hour and 23 minutes. Gov't Ex 3_BATES X. The log shows that Reddy left the conversation first. Gov't Ex. 1 at 6. The initial greetings and conclusion of the interview were not recorded, but the substantive discussions with the witness were recorded. Moreover, TFO Lee prepared an 8-page report of this interview on June 2, 2026, which was provided to Defense in Volume 10. Gov't Ex. 3_BATES 0010615 – 0010622.

***Erin Drake – ODHS Community Based Care Exceptions Coordinator***
**(Def. Ex. P_BATES 0010463)**

26. The Government interviewed Ms. Erin Drake on October 20, 2024. Gov't Ex. 4_BATES 0009687 – 0009689. The recording of the interview is approximately 41 minutes long. Def. Ex. P_BATES10463. The recording of the interview begins with introductions. From there, Ms. Drake explained the process of exceptional payments as it relates to adult foster care facilities to assist a provider in providing additional staffing. *Id.* at 1:47-9:00. Ms. Drake also explained that she had no personal knowledge of the Defendants' employees or residents; her role in the case was to process Medicaid payments for the Defendants.

27. Ms. Drake also explained that because of the volume of these cases they do not have "people popping into people's homes to verify that the staff are there . . . the program has turned into something it was never intended to do." *Id*. 16:04-16:41. She elaborated that the "Medicaid rates are really too low and so [providers] really struggle and objectively, I get it. The rates are pretty bad for foster homes; they have not been updated in decades, so when I say rate supplement, it has really just been for them to keep their doors open." *Id*. at 18:20-19:04. However, she also elaborated that there "is a lot of room for pocketing money that's not necessarily going to staff." *Id*. at 19:11. She also "ventured a guess" that "there's probably 90-

95% of providers that are not actually legally[11] employing as employers in foster homes . . . a lot of them are closely knit family type situations . . .” where the family members will work and the payment is to “fix your car or something.” *Id.* at 19:25-19:57. Ms. Drake continued to explain how the payment process works, and after another 20 minutes of discussion, the interview recording ended with everyone saying goodbye to each other.

***Jennifer Lawrence – ODHS Supervisor in Adult Foster Licensing***
**(Defense Exhibit M_BATES0010465)**

28. The Government interviewed Jennifer Lawrence on October 21, 2025, via the methods described above. Def. Ex. N_BATES0010560 (TFO Lee's Report). The interview recording is approximately 1 hour in length. Def. Ex. M_BATES0010465. The interview recording begins with introductions. Lawrence, in her supervisory role, oversaw the licensing process for the Defendants in this case. She explained to the Government how the licensing process worked from the license issuance until the suspension. Lawrence also walked through the specific issues that DHS had with the Defendants during monitoring visits, though she was not present in the home until suspension. During the suspension, Lawrence explained that a friend showed up and was “really angry” and that a family member was upset because they “thought [the Defendants] were fantastic.”[12] *Id*. at 55:40-57:04.

[11] Defense argues that this portion of the interview is exculpatory because it is indicative of the “family dynamic and arrangement that Ms. Valmont and Ms. Andre have put forth as a defense and yet was notably omitted from the reported account of the interview.” ECF 111 at 13. As the recording shows, the witness did not suggest that these types of arrangements are legal, only that in her experience, they are common. Ms. Drake was also not commenting specifically on the Defendants' arrangement, because she has no personal knowledge of that as she was never physically in Velida's. Moreover, Defendants were in receipt of this recording seven months prior to trial and to the Government's knowledge, have not attempted to interview Ms. Drake.

[12] Defendants argue that this statement should have been included in TFO Lee's 7-page report he prepared in this case. ECF 111 at 12. Yet, Defendants have not provided legal authority that requires the Government to transcribe every detail from a nearly 1-hour interview into a report.

***Mackenzie Clark – ODHS Licensor* (Def. Ex. J_ BATES0010474)**

29. The Government interviewed Mackenzie Clark on October 20, 2025. Gov't Ex. 5 (TFO Lee's Report). The interview recording is 28 minutes long, but the interview with the witness was only approximately 22 minutes long. Def. Ex. J_BATES0010474. The recording begins with AUSA Carmen Rodriguez mid-sentence, orienting the witness to the Defendants in the case. From there, Clark explains her role in the case and her memory of the interactions she had with Defendants based on her role as a licensor. Clark repeatedly stated throughout the interview that she did not remember details and referenced her narratives frequently. *Id.* at 5:10, 7:01; 8:27; 10:25; 12:27.

30. During the interview, Clark referenced photographs that were taken during one of the monitoring checks she participated in. *Id*. at 14:33-14:53. At approximately 21:32 minutes into the recording, AUSA Carmen Rodriguez indicated that she did not have any additional questions and handed it over to TFO Lee so he could collect administrative information for the witness. At 23:22 the witness left the meeting, and TFO Lee stated, "hold on real quick, Carmen," asking her to stay on the meeting. *Id.* at 23:25.

/ / /

---

The report is merely a summary. The Government provided both the recording and the report to Defendants and therefore has complied with its discovery obligations. Indeed, so long as the Government, as it did here, produces the substantive information, the format does not matter. *See e.g. United States v. Riley*, 189 F.3d 802, 807 (9th Cir. 1999) (noting that "because the interview notes that defendants received included [the witnesses'] substantially verbatim statements, defendants were not prejudiced by the Government's failure to produce formal summaries of those statements"). Moreover, TFO Lee's reports are Jencks statements for him, but not the potential witness, unless the witness adopted them – and they have not here. *United States v. Terragna*, 390 F. App'x 631, 639 (9th Cir. 2010). Any purported discrepancies between the recordings and reports are ripe for cross-examination of TFO Lee but do not amount to a discovery violation.

31. Outside of the presence of the witness, TFO Lee and AUSA Carmen Rodriguez then discuss whether they will call Clark as a witness at trial. AUSA Carmen Rodriguez expressed concern that the Government "did not have any photos for any of these monitoring visits" though they sent a subpoena to ODHS for records. *Id*. at 23:55. TFO Lee said "yeah, that can't be held against us. I mean we have tried. The subpoena shows what we asked for. The fact that they didn't comply." *Id.* at 24:11. AUSA Carmen Rodriguez stated that she would ask again for the photos; TFO Lee said "that's not going to change the fact that defense will try to make it a discovery issue." *Id.* at 24:30. AUSA Carmen Rodriguez stated, "I mean, they are not in my possession," and TFO Lee responded, "since when has that stopped them, c'mon?" *Id.* at 24:32-24:37. TFO Lee explained "that's their new stance…it's what we have increasingly seen from the defense bar. They are trying to get us to proactively create discovery for them. It's like we don't have it to discover to you, well then you have a proactive, you know, responsibility to proactively find it for me . . . it's like no." *Id.* at 24:40. In response, AUSA Carmen Rodriguez stated, "no, that's bullshit." *Id.* at 25:08. The conversation continued between them regarding the interviews scheduled for the next day and other case matters. The recording ended after 28 minutes.

***Naila Lundstrom - Tigard High School Social Worker*** **(Def. Ex. H_BATES10470)**

32. On October 23, 2025, the Government interviewed. Naila Lundstrom. Gov't Ex. 6 (TFO Lee's Report). The recording of the interview is approximately 45 minutes long. Def. Ex. H_BATES 10470. The recording does not include the initial introductions between the individuals on the meeting but begins with the first substantive discussion topic – when Lundstrom first received a referral to provide care for Minor Victim 1 (MV1) in her capacity as a school social worker. Lundstrom then detailed her interactions with Defendant Andre and MV1,

including her repeated efforts to coordinate medical care for MV1 for her ongoing heart issues. At the end of the interview AUSA Carmen Rodriguez asked Lundstrom whether there was anyone else at Tigard High who might know about the situation. *Id*. at 40:15. Lundstrom stated, "maybe her therapist"[13] and AUSA Carmen Rodriguez stated, "that sounds like it is covered by privilege with her therapist . . . if you tell me then, then a lot of people are gonna know she is going to therapy and I think I would rather not know." *Id.* at 40:30-41:02. The interview ended at approximately 44:05 minutes into the recording with conclusory remarks. The recording continued for approximately 20 seconds while the Government had a brief discussion about the information learned from the witness outside of the witness' presence.

***Information Obtained from Oregon Department of Justice***

33. On October 1, 2026, Rebecca Babarksy, a Senior Assistant Attorney General for the Health and Human Services branch of the ODOJ, informed the Government that she contacted all of the ODHS employees listed in the table in paragraph 9 above. Gov't Ex. 7 (Email from AAG Babarksy). She received responses from all employees except Melissa Canning. *Id*. Only Lizzie Newton stated she had been contacted by a defense investigator and a defense attorney related to this case. *Id.* The other witnesses all indicated they had not been contacted by a defense attorney or investigator. *Id.*

[13] Defendants argue that Ms. Lundstrom told the Government that MV1's therapist was someone to "whom [MV1] made no disclosures" and that this statement is exculpatory. ECF 111 at 18. However, that is not what the recording shows. Ms. Lundstrom offered the therapist as someone who "maybe" had information; Ms. Lundstrom did not state she had personal knowledge about MV1's disclosures, or lack thereof. Moreover, as detailed in the Government's Opposition to Defendant's Request for Rule 17 Subpoena (ECF 94), communications between a therapist and their patient are privileged and therefore it would be improper for the Government to inquire into these communications without first asking the privilege holder – MV1 – whether she is waiving her privilege. To date, MV1 is asserting her privilege, through her counsel, as represented during the recent hearing.

## III. ARGUMENT

### A. There Was No *Brady* Violation Because The Information Was Disclosed Nearly Seven Months Before Trial

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Court later extended the disclosure duty to include evidence impeaching the testimony of a government witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The Court also held that the duty to disclose applies even absent a request by the defendant. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also United States v. Bruce*, 984 F.3d 884, 894–95 (9th Cir. 2021). Defendants cannot establish all three *Brady* prongs with respect to challenged evidence, as detailed further below.

Criminal discovery is governed by an interlocking set of rules that includes *Brady* and the Due Process Clause, Federal Rule of Criminal Procedure 16, and the Jencks Act, 18 U.S.C. § 3500. The Ninth Circuit has held that witness statements, and the timing of their production, are governed exclusively by the Jencks Act. *United States v. Yandell,* 2 No. 2:19-cr-00107-KJM*,* 2023 WL 2071282 (E.D. Cal. February 16, 2023). When a defendant seeks evidence that falls within both *Brady* and *Jencks,* "the Jencks Act standard controls." *United States v. Jones,* 612 F.2d 453, 455 (9th Cir. 1979). Under the Jencks Act, government witness statements are not

discoverable until after the witness testifies on direct; because such late production would make trials unmanageable, the government voluntarily produces Jencks Act statements before trial. *See, e.g., United States v. Mills,* 641 F.2d 785, 790 (9th Cir. 1981) (granting mandamus and holding that a trial court "exceeded its authority" by ordering production of witness statements before trial). The rules governing *prospective* government witnesses also recognize that pretrial disclosure is not required at all under the Jencks Act, *United States v. Cadet,* 727 F.2d 1453, 1469 (9th Cir. 1984), unless the statement also falls within *Brady.* Courts recognize that witness statements, unlike other evidence covered by Rule 16, are sensitive and that different timing rules under Jencks are needed to protect witnesses and potential witnesses from "threats, bribery and perjury." *Mills,* 641 F.2d at 790.

**B. The Recorded Interviews Were Disclosed Well Before Trial And In Enough Time For The Defense To Make Effective Use Of Them**

Defendants' motion correctly identified recordings of witness interviews that contain both inculpatory and exculpatory information. The statements are also Jencks statements if these witnesses testify at trial. *See, e.g.*, 18 U.S.C. § 3500. For these reasons, the statements must be disclosed, and they were – months before trial, well before the statute mandates disclosure and in enough time for the Defense to make effective use of them. However, the narrative reports that named each witness and detailed their interactions with the Defendants were disclosed in January 2025. These reports provided the Defense with the opportunity to assess the witnesses' relevance and determine whether further investigation was necessary. Defense was in possession of these statements for nearly a year and a half before they received the recordings and subsequent FBI reports, which were disclosed in June 2026 – still seven months before trial. The motion fails because discovery deadlines have not passed, and Defendants have suffered no prejudice.

The Defendants' motion appears to imply that *Brady* imposes immediate disclosure of all exculpatory or impeachment information. Timing for production of witness statements is, however, governed by the Jencks Act. *Jones,* 612 F.2d at 455. The motion to dismiss cites no authority suggesting that *Brady* mandates disclosure of material for potential trial witnesses in the weeks, months, or years in advance of trial because that is not the standard. Indeed, *Brady* "merely requires the government to turn over the evidence *in time for it to be of use at trial*." *United States v. Fernandez,* 231 F.3d 1240, 1248 n.5 (9th Cir. 2000) (citations omitted; emphasis in original). The Ninth Circuit has found that disclosures made to the defense during a multi-week trial did not violate *Brady*. *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) ("*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial."). Instead, to escape a *Brady* sanction, disclosure "must be made at a time when disclosure would be of value to the accused." *Id.* (quoting *United States v. Davenport,* 753 F.2d 1460, 1462 (9th Cir. 1985)).

Instead, the question is whether the Defense has adequate time to prepare. *See United States v. Alahmedalabdaloklah* ("*Oklah*"), 94 F.4th 782, 828 (9th Cir. 2024) (finding no prejudice when late disclosures of impeachment information occurred days prior to trial). The Court set a discovery deadline for November 3, 2026. The Government is adhering to its discovery obligations and will continue to do so, including by way of ongoing requests for impeachment material from law enforcement agencies and disclosure of the material received. Given that the material at issue is within Defenses' possession months prior to trial, and the court-ordered discovery deadline is still has not yet passed, the motion to dismiss is premature and fails to establish a violation of *Brady*, *Giglio,* or the governing Jencks Act.

Moreover, to establish a *Brady* violation, Defense must demonstrate that evidence was suppressed and that they suffered prejudice. *Strickler*, 527 U.S. at 281–82; *Bruce*, 984 F.3d at 894–95. Defense has not and cannot show prejudice in this case.

Instead, Defense rely on speculation. They suggest that their decision to waive their Speedy Trial rights was impaired because they lacked full discovery at that time. They offer no authority for the notion that a Speedy Trial waiver requires complete discovery; and such a requirement runs contrary to Rule 16's recognition that the Government's discovery obligation is an ongoing one; we produce new information as the investigation and trial preparation attracts additional information. Defendants' motion fails to recognize controlling Ninth Circuit precedent that sets a different timeline for Jencks Act statements, and they offer vague, unspecific harm. ECF 111 at 20. Moreover, Defense fail to acknowledge that they sought the fourth continuance in this case because of the superseding indictment "alleging new charges that are legally and factually independent of the prior charges and which involve allegations of healthcare fraud." ECF 63 at 1. Defense also required additional time to review the 9 Volumes of discovery with a "lens to the new criminal charges," and assess whether they needed to request additional discovery. *Id*. 2. So, Defendant's own motion admits that their request for continuance was made with full knowledge that discovery was ongoing and incomplete.

Defense also argues that the witnesses in this case may have faded memories at trial, and the Government's late disclosures therefore prejudiced their ability to investigate the case. This argument is speculative and misplaced. The ODHS potential witnesses interviewed above are not typical layperson fact witnesses. For the reasons already addressed, they provide collateral support for the charges. They are employees for the State of Oregon. They routinely document their interactions with providers and are required to do so in the course of their employment.

During the interviews in this case, these potential witnesses frequently referenced their narratives, photos, or other notes when providing information. At trial they can do the same. There is no evidence that their memories are so faded that they cannot be properly refreshed, as they were during their interviews.

Moreover, though the Government acknowledges that disclosing the recordings months after disclosing the reports was not ideal, Defense had the witnesses' narratives in January 2025 – two years before this case is scheduled to proceed to trial. During that time, Defense was free to interview these witnesses and challenge their memory or veracity. They elected not to do so, except for Ms. Lizzie Newton. Defenses claim that the ODHS witnesses' memories have faded is pure speculation untethered to the record before the Court.

Trial has not occurred and the discovery deadline has not passed. As laid out above, *Brady* and *Giglio* require the Government to disclose exculpatory and impeachment information in such time that Defense may effectively use that information at trial. If the defendant has "a substantial opportunity to use the belatedly disclosed evidence, there is no prejudice." *Alahmedalabdaloklah* ("*Oklah*"), 94 F.4th at 827–28 (citing *Gordon*, 844 F.2d at 1403); *see also United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978) (holding that "there can be no claim of prejudice insofar as the defendant was enabled to present to the jury favorable or impeaching evidence."). Because Defendants in this case have received what they demanded, months before trial, there is no prejudice, and therefore, no justification for dismissal.

Even if there were a *Brady* violation, which there was not, dismissal would be a wholly inappropriate windfall for Defense. "[T]he drastic step of dismissing an indictment is a disfavored remedy." *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988). Such a dismissal primarily functions to "remedy a constitutional or statutory violation"; "protect judicial integrity

by ensuring that a conviction rests on appropriate considerations validly before a jury"; and "deter future illegal conduct." *United States v. Stinson*, 647 F.3d 1196, 1210 (9th Cir. 2011) (citations omitted). Dismissal based on the government's failure to comply with its discovery obligations, including discovery orders issued by the court, lies within a Court's supervisory powers, *Jacobs*, 855 F.2d at 655, but is an "extreme remedy" that is seldom appropriate, *United States v. Lopez*, 4 F.3d 1455, 1464 (9th Cir. 1993). Seizing on dismissal without even considering less severe sanctions can itself be an abuse of discretion. *See, e.g., United States v. Kuyoro,* 175 F. 4th 630, 640 (5th Cir. 2026) (reversing dismissal because the "district court failed to impose the least severe sanction that would remedy any discovery violation.")

Defendants face serious charges for abusing vulnerable workers and defrauding government benefit programs; they should not avoid accountability because they received discovery in piecemeal fashion but well before trial.

**C. There Was No Prosecutorial Interference With Witnesses**

The Supreme Court has recognized that the government may not substantially interfere with the testimony of defense witnesses.*Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (per curiam) (overturning a conviction when the trial judge singled out a defense witness and admonished them about the "dangers of perjury" at length).[14] Though *Webb* involved the conduct of a judge, the Ninth Circuit extended *Webb* to the conduct of prosecutors. *United States v. Vavages*, 151 F.3d 1185, 1189 (9th Cir. 1998). The inquiry is the same regardless of whether the witness is a

[14] The "prototypical *Webb* challenge involves conduct so threatening as to 'effectively drive [the] witness off the stand.'" *United States v. Juan*, 704 F.3d 1137, 1142 (9th Cir. 2013) (*citing to United States v. Jaeger*, 538 F.3d 1227, 1231 (9th Cir. 2008). Defense does not argue that ODHS witnesses will not testify, nor has a showing been made that they will not comply with subpoenas to testify.

government or defense witness because the “constitutional harm to the defendant is the same.” *Juan*, 704 F.3d at 1142. In order to prevail, the defense must “demonstrate misconduct by a preponderance of the evidence.” *Vavages*, 151 F.3d at 1188 (*citing to United States v. Lord*, 711 F.2d 887, 891 n.3 (9th Cir. 1983). Indeed, the “substantial inference inquiry is extremely fact specific,” and the defense must show that under the totality of the circumstances that “the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary[.]) *Id.* at 1190.

Here, Defense point to two categories of statements in the recordings: 1) flippant statements made amongst the attorneys and TFO Lee after the witnesses left the interview; and 2) statements made to Reddy about defense investigators. Defense argue that these statements amount to prosecutorial misconduct. Yet, on the record before the Court, the Defense cannot show substantial Government interference with witnesses by a preponderance of the evidence. Each category of information will be addressed in turn.

The Government does not condone the flippant statements made on the recordings. Addressing first the statements made amongst attorneys and TFO Lee, outside of the presence of witnesses – these statements were made when TFO Lee was inadvertently recording internal case discussions with AUSA Carmen Rodriguez. Defense have made no showing that these statements impacted the potential witnesses, because they were made outside of their presence. *See e.g. Juan*, 704 F.3d at 1142 (holding that because the prosecutor’s statements were not made to the witness, “the necessary causal link” for prosecutorial misconduct was missing); *see also Park v. Thompson*, 851 F.3d 910, 921 (9th Cir. 2017) (finding government interference with a witness occurred when agent made veiled threats to the witness, a domestic violence victim, about her abuser being “really upset” by her potential testimony, and after the defense “made

substantial efforts" to obtain the witnesses' testimony, including serving the witness with a subpoena). The causal link[15] is similarly absent here.

Moreover, the Government acknowledges the poor word choice in the "bullshit" statement regarding the Government's discovery obligations. The Government readily accepts its burden of due diligence to comply with its ongoing discovery obligations. The Government will continue to comply with its obligations. However, this statement was not made to the witness, and the discovery that was discussed in this recording was requested and provided to Defense as detailed in the chart above.

Moving next to the statements made to Reddy about defense investigators. These statements were made after Ms. Reddy repeatedly expressed confusion about the involved parties in the interview and the purpose of the interview. It was only in that context that AUSA Carmen Rodriguez and TFO Lee attempted to clarify the roles of the defense investigators and how they may identify themselves, should they reach out. Though the comments were unartfully worded, they were only intended to educate the witness, not sway the witness in a particular manner. In other related contexts, Courts have found that it may be appropriate for the Government to give warnings to a witness. For example, in the context of a prosecutor admonishing a witness about perjury, there are many situations where "warning a witness about the possibility and consequences of perjury charges is warranted." *Juan*, 704 F.3d at 1142; *See, e.g. Williams v. Woodford*, 384 F.3d 567, 603 (9th Cir. 2004) ("merely warning a witness of the consequences of

[15] In *Thompson*, the Ninth Circuit held that "precedent requires some 'causal link' between the government's conduct and the witness's decision not to testify," but left open for another day the degree of causation required because the facts "contain[ed] sufficient factual allegations to preclude us from affirming on causation grounds under any reasonable standard." *Thompson*, 851 F.3d at 920-921.

perjury does not unduly pressure the witness's choice to testify or violate the defendant's right to due process."); *see also United States v. Davis,* 974 F.2d 182, 187 (D.C. Cir. 1992)("[A defendant's] rights are not trenched upon by mere information or advice about the possibility of a perjury prosecution, but by deliberate and badgering threats designed to quash significant testimony."). The Government's intent was only to warn the witness, not sway or discourage the witness.

These statements were also made in the backdrop of another witness reporting confusion about how the defense investigators identified themselves. Unquestionably, witnesses may be confused about who they spoke with absent any intent on the part of investigators to mislead. When Marc called TFO Lee after learning he was speaking to defense investigators, TFO Lee expressed to Marc that the Defense investigators were "professionals" who did not pose him any harm. As a result, Marc agreed to briefly speak with the investigators. This shows that the Government was not attempting to interfere with defense access to witnesses and reinforces the intent behind the statements, though the execution with Reddy could have been more artful. Regardless, there is no evidence that Defense have attempted to contact Ms. Reddy, or any other ODHS witness, except for Ms. Newton. Without a showing that Defense made attempts and the witnesses refused to speak to them based on the Government's conduct, the claim that Defendants were prejudiced is mere speculation.

Finally, addressing the statements made to Melissa Canning. The statements to Canning were in reference to her civil lawsuit against Washington County for claims of unlawful termination. Part of the dispute between Canning and her employer involved her being placed on the "Brady list" due to an alleged theft of salsa from a restaurant. During the interview, Canning stated that she could provide the civil case number to the Government; she also repeatedly stated

that the information is available on public forums. Indeed, it is.[16] In this discussion, TFO Lee stated that Canning could "hold off" on sending the civil documentation. However, this was not done to attempt to hide from the potentially derogatory information. And Courts recognize that the Government does not "suppress" publicly available information. *See, e.g., United States v. Barroso,* 719 Fed. Appx. 936, *4 (11th Cir. 2018) (holding that potential impeachment of law enforcement witness, available on a public website, "doomed" *Brady* claim).

It is still unclear whether Canning will be called as a Government witness; if she is, the Government is in the process of requesting potentially derogatory information for law enforcement witnesses (or former in Canning's case). This Government does not typically undergo this process until closer in time to trial, when the law enforcement witnesses have been identified. Moreover, the deadline the Court set for providing this information is December 1, 2026. The Government sent a formal request to Canning's prior agency for any derogatory information on September 11, 2026. The Government will provide *Giglio* information to Defense upon receipt.

Without a showing that the Defense reached out to these witnesses and they refused to speak to Defense counsel or investigators due to the Government's comments, there is no causal link. Because there is no causal link, Defense cannot meet their burden of showing any prejudice ensued from the Government's remarks.

/ / /

/ / /

/ / /

[16] The Government retrieved this information from the public docket and provided it to Defendants in Volume 14 of discovery on October 6, 2026.

## IV. CONCLUSION

For the reasons above, Defense cannot show prejudice or a *Brady* violation. Nor can they show prosecutorial misconduct occurred because there is no evidence the Government's statements had an impact on the ODHS potential witnesses. The information was disclosed well before trial, discovery deadlines have not passed, and the Defenses ability to use it the impeachment evidence is unimpaired. Dismissal is unwarranted and unsupported. The motion should be denied.

DATED: October 7, 2026

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

*/s/ Arin Heinz*
ARIN C. HEINZ, MIB #P80252
Assistant United States Attorney

A. TYSEN DUVA
Assistant Attorney General
Department of Justice
Criminal Division

*/s/ Elizabeth Hutson*
ELIZABETH HUTSON, VAB #85763
Trial Attorney
Human Rights and Special Prosecutions Section