Peyton Lee, OR SBN 164224
Assistant Federal Public Defender
Email: Peyton_Lee@fd.org
Michael Benson, AK Bar No. 1311070
Email: michael_benson@fd.org
Assistant Federal Public Defender
Fidel Cassino-DuCloux, GA SBN 40244
Federal Public Defender
Email: fidel_cassino-ducloux@fd.org
101 SW Main Street, Suite 1700
Portland, OR 97204
Tel: (503) 326-2123
Attorneys for Defendant

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARIE GERTRUDE JEAN VALMONT,<br><br>Defendant. | Case No. 3:24-cr-00353-AN-2<br><br>REPLY TO GOVERNMENT'S RESPONSE (ECF 162) TO MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT AND VIOLATIONS OF *BRADY* AND DUE PROCESS (ECF 111)<br><br>*Oral Argument Requested* |

Defendant, Marie Gertrude Jean Valmont, through her attorneys, Peyton Lee, Michael Benson and Fidel Cassino-DuCloux, submit the follow reply to government's response (ECF 162) to Ms. Valmont's Motion to Dismiss for Prosecutorial Misconduct and Violation of *Brady* and Due Process (ECF 111).

## I. Introduction

The government makes no response regarding its affirmative misrepresentations made repeatedly to the Court and defense that discovery was complete, when the government was well aware that it was not. The government makes no response to its obligations under Rule 5(f), which places an affirmative obligation for timely disclosure, and explicitly discusses the sanction pled for by the defense in dismissing the case.

The government does acknowledge and concede the initial prongs of *Brady*, that the evidence which was withheld was favorable,[1] and that suppression occurred (the government describes "piecemeal production" and "a mistake").[2] What is left is whether Jencks timing somehow excuses the delay, whether there was prejudice, and what remedy is appropriate. Further, the government admits to the impropriety of its statements to witnesses,[3] leaving only the question of the degree of misconduct and the appropriate remedies and sanctions.

[1] "Defendants' motion correctly identified recordings of witness interviews that contain both inculpatory and exculpatory information." ECF 162 at 22.

[2] "[W]hat was unclear to the prosecutors at that time was that the case agent also recorded those interviews." ECF 162 at 4. "This piecemeal production was neither ideal nor intended; it was, however, a mistake that was corrected[.]" *Id*. The government does not argue the evidence was disclosed; it argues only that the timing was acceptable.

[3] "the Government suggested that the Defense might use 'shady' tactics. That characterization . . . was unfair"; "The Government does not condone the flippant statements made on the recordings." ECF 162 at 4, 28.

## II. The government's recounting of the factual background minimizes its conduct.

### A. Delayed *Brady* Disclosures

The government begins its motion by "acknowledg[ing] and conced[ing] . . . [that] when it produced the witness reports without also referencing the recordings, it left the defense with the *mistaken impression* that it had all the information surrounding those witness interviews." ECF 162 at 5 (emphasis added). This characterization understates the government's conduct and leaves out its own affirmative representations regarding discovery.

The government's disclosure in December of 2025 only contained reports from five of the fourteen interviews. *See* ECF 162 at 10-11 (reports disclosed in June 2026 for interviews conducted in October 2025: Nancy Avila, Kizzie Newton, Jennifer Lawrence, Gita Reddy, Alicia Bilbao, Melissa Canning, Julia Killen, Naila Lundstrom, and Valorie White[4]). The government did not merely disclose audio *recordings* in a delayed capacity. The government acknowledges that "disclosing the *recordings* months after disclosing the *reports* was not ideal." ECF 162 at 26 (emphasis added). This ignores entirely that the government disclosed *reports* months after the *interviews*. It wasn't merely that the defense received December 2025 reports which failed to include or reference their audio recordings; the defense failed to receive nine reports which would document the October interviews until June of 2026, when the unknown audio recordings were also disclosed.

---

[4] The defense had previously discussed 13 interviews. There were 13 recorded interviews, but 14 total interviews as TFO Lee did not record the interview of Valorie White, a DHS employee whose report was provided in June 2026. *See* ECF 162 at 9, n. 5.

It may be the case that the prosecuting attorneys did not know about the audio recordings. The statements made during those recordings certainly raise that possibility. However, this does not resolve or excuse the violations. Regardless of knowing about the audio recordings, the government attorneys knew the *interviews* had been conducted and had not been documented and disclosed to the defense. Whether they had received reports or not, they were aware of the existence of the interviews, and aware that the defense had not received reports for eight of the interviews in the December 2025 disclosures.

The government claims that it "produced reports of those interviews as soon as the agent generated them." ECF 162 at 5. It is unclear how this could be the case, as the "Date drafted" for most of the reports is the same as the interview date. It also does not address that the government is responsible for its own agent's conduct. *Kyles Whitley*, 514 U.S. 419, 437 (1995).

Additionally, the government makes no response or justification for why those reports omit critical information, including the fact that TFO Lee had audio recorded the interviews.[5] In a footnote, the government takes the position that reports do not need to "transcribe every detail" from a 1-hour interview. ECF 162 at 18-19 n.12. The defense is well aware that reports are often summary, however the government does not address the *pattern of omissions* that repeats in the reports; it is not that the reports lack detail, it is that they lack precisely those details which would be beneficial to the defense, or harmful to the government. The government points to *United States v. Riley*, 189 F.3d 802, 807 (9th Cir. 1999), quoting "because the interview notes

[5] The government seems to acknowledge the incompleteness of the written reports, writing that "the substantive information the witnesses provided was captured on the recordings *or* in the reports of that interview." ECF 162 at 12 (emphasis added).

that defendants received included [the witnesses'] *substantially verbatim statements*, defendants were not prejudiced by the Government's failure to produce formal summaries[.]" ECF 162 at 19, n. 12 (emphasis added). But here, the reports of TFO Lee do not provide verbatim statements, in fact they omit entire portions of substantive, beneficial information which the defense was entitled to, and only received due to a recording that the government was unaware even existed. *See,* ECF 111 at 10-13.

The government also does not address the delay in multiple other reports being disclosed to the defense. ECF 111 at 9; ECF 77 at 4-5. For example, in attempting to justify their conduct when speaking with Ms. Reddy, the government relies heavily on the allegations of Mr. Marc to TFO Lee that he was contacted by defense investigators in 2024 and had concerns about that conversation. ECF 162 at 6 ¶2.[6] This report provides another demonstration of the delays in disclosures to the defense; TFO Lee spoke with Mr. Marc on December 10, **2024**, dated his Investigation on that date, and entered the report in June of 2026, when it was subsequently provided to the defense. Def. Ex. 1, TFO Lee's Report_BATES 10536.

The government also describes the defense as having been left with a "mistaken impression," because the audio recordings were not referenced in the 302 Reports that were provided, that defense had complete discovery. This ignores that it was not a mistaken impression, but rather the repeated, affirmative representation of the government to defense and

[6] The government cites this interview of TFO Lee's Report_Bates 10536 as Exhibit 2. The defense's copy of the exhibits to the government motion ECF 162 did not have that report as Exhibit 2. Defense encloses it here as Defense Exhibit 1, as well as the audio recording that Mr. Marc made of his conversation with defense investigators as Defense Exhibit 2.

the Court that all discovery had been completed throughout the spring of 2026, in their emails and filings. *See,* ECF 111 at 7-8.

The government emphasizes that the ODHS employees interviewed in October 2025 were referenced in the narrative or in the APS investigative files that had been received from ODHS and previously provided. The "Narratives" do not resolve the issues surrounding *Brady* and Rule 5(f) disclosures. Just because a report has previously referenced a witness and their prior statements does not make their future statements to the government, particularly statements that the government has conceded include exculpatory information, no longer subject to *Brady* disclosure obligations. The question is not whether the defense could have known a witness existed, but rather whether the government was in possession of material information that it was obligated to disclose to the defense.

Additionally, the ODHS narrative reports provided in January 2024 did not put the defense on notice as to the need to interview the ODHS employees in the manner the government relies on. Those investigations were provided while the pending case contained only charges of forced labor, not healthcare fraud. The witnesses had minimal relevance. At most, their investigation helped demonstrate that there were people in and out of the home who might have observed AV1, AV2 and MV1 at the residence and whether they were working. If they were not, ODHS employees might have been impeachment of AV1, AV2 and MV1 because they could show AV1, AV2 or MV1 were not engaged in labor for the forced labor charge.

DHS witnesses who did not report AV1, AV2, and MV1 as being in the home would have the opposite impact on the fraud charges. If AV1, AV2 and MV1 were not in fact seen, or were seen not working, that is precisely one of the bases for *fraud* that is now alleged by the

government in the superseding indictment in January of 2026. Their role as potential witnesses was inverted by the charges in January 2026, without any information about the disclosures made in October 2025 that constituted the fraud allegations. The motive for defense to investigate or interview ODHS witnesses is completely different with the forced labor charges versus the fraud allegations. The questions asked, and the role of ODHS or APS employees, would be entirely different for allegations of healthcare fraud from the forced labor charges.

The government also does not provide explanation for why they repeatedly asked witnesses to "hold off," or why they would "rather not know" potential exculpatory information.

The government recounts the Canning interview and the *Brady* listing, without explaining why such information was not requested until September 2026, nearly 11 months after the witness explained that she was *Giglio* impaired. The government cites an out of Circuit case, *United States v. Barroso*, 719 F. App'x 936 (11th Cir. 2018), for the proposition that what it does not know about cannot be *Brady*. That case deals with publicly available information (as opposed to a Washington County Brady List or police investigation), when there was no indication the government knew about, *or should have known* about the information. *Id.* at 939-40. This is not a case where the government merely failed to produce a public record; the government declined a document that the witness offered twice, about impeachment the case agent already knew of. That forms the exact kind of conscious avoidance prohibited under *Carriger v. Stewart*, 132 F.3d 463, 479–80 (9th Cir. 1992) (en banc). Similarly, the government declined to have a witness identify MV1's therapist, and claims this was related to privilege; however, privilege does not form a basis for the government to decline to learn the identity of a potential witness.

The government says that it should be given credit for its "self-corrections." ECF 162 at 6. The Government objected to, and continued to resist, a discovery deadline requested by the defense. ECF 77 (Defense Request for Discovery Deadline); ECF 83 (Government Response). In a filing more than two weeks after the request for discovery deadline, ECF 78 Government's Response to Defendant Valmont's Motion for A Bill of Particulars, the government again asserted that they have "provided the defendant with full discovery[.]" ECF 78 at 8. The government did not self-correct but instead continued to object to deadlines and represent that discovery had been completed when it was not.

The government's argument regarding the defense continuance inverts the record. The government says the defense "sought the fourth continuance in this case because of the superseding indictment" and therefore knew "discovery was ongoing and incomplete." ECF 162 at 25. The defense sought that continuance after the government wrote, on January 21, 2026, that "[t]hese charges do not involve any new discovery and instead are supported by evidence that has already been disclosed to you" (ECF 111 Ex. B), and after it told the Court that "[n]o additional discovery was disclosed to either of the defendants in connection with the added charges." ECF 74 at 2-3. The government cannot use the defense's reliance on its own representation as proof the defense was not misled.

**B. Witness Interference**

With regards to the witness tampering allegations, the government describes the statements as "attempting to differentiate the federal criminal case from other, unrelated civil litigation," when they indicated the defense might use "shady" tactics. ECF 162 at 5. The Court has the interview transcript with Ms. Reddy and can reach its own conclusions about context. It

appears, in full context of the interview, that the government is not attempting to differentiate the *federal* versus the *civil* cases, but rather to differentiate the *government* function from the *defense* function.

In addition, the prior conversations with Mr. Marc do not justify TFO Lee and AUSA Rodriguez's statements. The government was already in receipt of the (unauthorized) audio recording created by Mr. Marc of his conversation with two defense investigators. It has been enclosed here as Defense Exhibit 2. The first statements in that recording from the defense investigators to the witness, with the assistance of a Haitian Creole interpreter, are their identification of themselves as defense investigators working for Ms. Valmont and Ms. Andre. Any notion that there was misrepresentation, or that the government might have believed there had been misrepresentations based on their discussions with Mr. Marc, is belied by the evidence.

Finally, the government adds to its conduct with regards to witnesses by submitting Government Exhibit 7, their further contact with witnesses to try to obtain information about their conversations with defense counsel and/or defense investigators. On October 1, 2026, the government had a Senior Assistant Attorney General for ODOJ, canvass every ODHS witness about defense contact. ECF 162 at 17; Ex. 7. That happened eight days after the motion to dismiss was filed.

**III. Pretrial disclosure does not resolve the *Brady* violation.**

The government claims that "[a]ll these items were timely produced[.]" ECF 162 at 5. They were not. These were not timely produced under *Brady*, federal law or under the Court's direct orders.

### A. *Brady* obligations and Rule 5(f) override Jencks timelines.

The government largely relies on an assertion from an unpublished, out of district court case from the Eastern District of California, alleging that Jencks deadlines are the only relevant deadlines for disclosures. *United States v. Yandell* 2 No. 2:19-cr-107-KJM, 2023 WL 2071282. This is not, as the government asserts, something that "the Ninth Circuit held," but an unpublished district court decision. ECF 162 at 22. The analysis in *Yandell* that the government seeks to rely on is based on *United States v. Jones,* 612 F.2d 453 (9th Cir. 1979). There are two fundamental problems with the government's assertion that somehow the statutory obligations of Jencks override their constitutional obligations under *Brady*.

First, *Jones* predates developments in the *Brady* caselaw which the government fails to cite or grapple with. *Jones* treats impeachment evidence as different from other types of evidence covered by *Brady*, however six years later the Supreme Court in *Bagley* explicitly "rejected any such distinction between impeachment evidence and exculpatory evidence" for purposes of the question of materiality. *United States v. Bagley,* 473 U.S. 667, 676 (1985). The Court in *Bagley* makes clear that materiality requires that the "evidence [be] considered cumulatively, not item by item." *Kyles*, 514 U.S. at 436; *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).

As another case from the Eastern District of California acknowledges:

> Recent developments also make clear that the duty to act is triggered by the materiality standard, i.e. by the cumulative quality of the evidence being sufficient to create a reasonable probability of a favorable outcome for the defendant. Under that standard, "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of *all* such evidence and make disclosure *when the point of 'reasonable probability' is reached.*" *Kyles,* 514 U.S. at 437 (emphasis added). This is a rule of constitutional law that arose after the advent of the *Jencks Act*.

*United States v. Sablan*, 2009 U.S. Dist. LEXIS 100724, *9-10 (E. D. Ca. 2009).

The Court in *Sablan* goes on to analyze this exact issue, pointing out that "*Brady* obligations are not altered or modified by the fact that the information is contained in witness statements . . . That reasoning is consistent with the due process requirements of *Bagley* and *Kyles*, which supersede the Ninth Circuit's decision in *Jones*." *Id.* at 10. The government's response never cites any of the more recent Supreme Court caselaw regarding its *Brady* obligations. They do not cite or address *Kyles*, *Carriger*, *Cloud*, *Bundy*, *Chapman*, *Price*, *Comstock*, *Black*, *Rich*, or *Gregory*.[7]

Additionally, the holdings in *Yandell* and *Jones* deal with concerns related to prospective informant testimony and do not involve explicitly exculpatory information. The Court in those matters is balancing concerns regarding pretrial disclosure of such information about an informant, against the defense's need to adequately prepare. No such concern exists here; these are not confidential informants needing further government protection, but instead evidence which the government agrees contains exculpatory information involving no special privilege for the government. The constitutional protections of *Brady* as articulated in the subsequent caselaw overrides the statutory timelines provided under the Jencks Act.

The government's citation to *United States v. Mills* further highlights this difference. 641 F.2d 785 (9th Cir. 1981). *Mills* is a decision that does not address *Brady* obligations at all and predates the *Brady* caselaw developments. The Court in *Mills* merely addresses whether

[7] *Kyles v. Whitley*, 514 U.S. 419 (1995); *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1992) (en banc); *United States v. Cloud*, 102 F.4th 968 (9th Cir. 2024); *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020); *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008); *United States v. Price*, 566 F.3d 900 (9th Cir. 2009); *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015); *United States v. Black*, 767 F.2d 1334 (9th Cir. 1985); *United States v. Rich*, 580 F.2d 929 (9th Cir. 1978); *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966).

statements by non-testifying witnesses fall under the Jencks Act and/or Rule 16 obligations; it finds that they do not. *Id.* at 790.

Notably, the government never mentions this Court's Rule 5(f) Disclosure Order (ECF 15) at all. The Order required timely disclosure of "all information or evidence known to the government . . . that might reasonably be considered favorable to the defendant's case," a standard expressly broader than materiality, and one that contemplates "dismissal of charges" as a sanction. *Id.* A Jencks Act timing rule does not displace a court order entered under Rule 5(f) which the government has failed to respond to.

**B. The Jencks Act does not apply to much of the evidence at issue.**

The Jencks Act reaches statements of witnesses the government calls at trial. The government has said that it "expects to, at most, only call a handful of these witnesses at trial" and that their information "is not nearly as central to the Government's case." ECF 162 at 9. In that case, for every witness the government does not intend to call, Jencks supplies no timing rule at all and only *Brady* and the Court's Order govern, and both required disclosure long ago.

The government cites *Cadet* for the notion that Jencks Act material is not required pretrial unless it is *Brady*, while not contesting that the material under discussion in this case is precisely *Brady* material. The Ninth Circuit in *Cadet* also emphasizes the government's affirmative obligations to seek out information beneficial to the defense, regardless of any specific command of the federal courts:

> No order was necessary to compel the government to accord due process to these defendants. Before this court, the government again offered to examine the personnel files for *Brady* material. That duty should have been performed in August of 1982, as soon as the government was made aware of the defendant's request for the personnel files in order to assist the defendants in their trial preparation. The prosecutor's oath of office, not the command of a federal court,

> should have compelled the government to produce any favorable evidence in the personnel records. While we cannot condone the prosecutor's recalcitrant behavior[.]

*United States v. Cadet,* 727 F.2d 1453, 1467 (9th Cir. 1984).

The government concedes the recordings contain "exculpatory information." ECF 162 at 23. Jencks is a floor on production, not a license to withhold favorable evidence; the Court's Rule 5(f) Order and *United States v. Cloud,* 102 F.4th 968, 979 (9th Cir. 2024) set the pretrial standard for *Brady* material. *Jones, Mills* and *Cadet,* are decisions about compelled pretrial production of government-witness statements. None involved a Rule 5(f) order, none post-dates the Due Process Protections Act, and none addresses *Cloud's* pretrial-favorability test.

**C. "Mistake" is Not a Defense**

The government asserts that the non-disclosure was "a mistake" caused by "a miscommunication between TFO Lee and AUSA Carmen Rodriguez about the existence of the recordings." ECF 162 at 3, 10. The government does not address the governing test. *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008). *Chapman* holds that intentional withholding is not required; flagrant misbehavior covers reckless disregard for the prosecution's constitutional obligations. *United States v. Bundy*, 968 F.3d 1019, 1042 (9th Cir. 2020). Here, the government was well aware that the interviews had been conducted, they had sat through all 14. Regardless of the existence of the audio recordings, the government knew that more than half of the interviews had not been documented or reported to the defense, despite containing exculpatory information and in conjunction with repeated affirmative representations by the government that discovery was complete.

Under *Kyles*, 514 U.S. at 437, the government also has a duty to learn of favorable evidence known to others acting on the government's behalf, and under *Carriger*, 132 F.3d at 480, the government "may not be excused from disclosing what it does not know but what it could have learned." A "miscommunication" that persisted through two bill-of-particulars responses asserting complete discovery (ECF 74, ECF 78) and an opposition telling this Court a discovery deadline was "unnecessary" (ECF 83) is recklessness, not inadvertence.

**D. There is prejudice.**

The government's theory that the defense received adequate notice through the ODHS narratives is unsupported. The government argues that the defense had the ODHS "narratives" naming each witness in January 2025, which "reasonably put defense on notice of each witness and their potential relevance." ECF 162 at 8 n.1, 23. Carried to its conclusion, the government would never have to disclose a witness statement so long as the witness's name appears somewhere in 13,441 pages. The Ninth Circuit in *Chapman*, 524 F.3d at 1080, upheld dismissal of the case and flagrant misconduct even where the government had disclosed over 400,000 pages and there was no finding of intentionally withholding the evidence.

The government's prejudice arguments are built on post-trial materiality cases, which is exactly the retrospective framing that the Ninth Circuit in *Cloud* held in 2024 does not apply before trial. *Fernandez*, 231 F.3d 1240 ("in time for it to be of use at trial"); *Gordon*, 844 F.2d 1397 (disclosure during a multi-week trial); *Davenport*, 753 F.2d 1460; *Shelton*, 588 F.2d 1242; and *Alahmedalabdaloklah*, 94 F.4th 782 (late disclosure days before trial). ECF 162 at 20, 22.

*Cloud* holds that this retrospective frame is the wrong one before trial: the "materiality standard usually associated with *Brady* . . . should not be applied to pretrial discovery of

exculpatory materials," and "the retrospective definition of materiality is appropriate only in the context of appellate review." 102 F.4th at 979. The government does not cite *Cloud*, does not distinguish it, and makes the same argument that *Cloud* rejected: that it cannot be sanctioned "simply because the district court caught its misconduct *too early*." *Id.* at 981 (emphasis in original).

The government cannot be rewarded in avoiding any *Brady* sanctions merely because the violation was discovered in advance of trial. As the Court in *Cloud* noted, "the rule is disclosure, not gaming the impact the disclosure might have." *Id.* at 978.

> [T]he Government asks us to create a perverse rule: that it cannot be sanctioned for withholding impeachment evidence about a critical witness whose testimony could have been determinative of guilt or innocence, simply because the district court caught its misconduct *too early*. This argument, if taken to its logical extreme, could risk preventing a trial judge from imposing *any* forward-looking *Brady* sanction under the rationale that there can be no due process violation unless and until the court permits the government's concealment of evidence to fatally taint the trial's result. Our precedents, however, foreclose that argument. Public trust in our judicial system is reinforced by courts protecting constitutional rights. "When a public official behaves with [] casual disregard for his constitutional obligations and the rights of the accused, it . . . chips away at the foundational premises of the rule of law."

*Id.* at 981.

As discussed in ECF 111, the prejudice from delayed disclosures includes eleven-month-old interviews, faded memories, and compelled disclosure of the defense theory. The government's October 1, 2026, canvass further means that a continuance cannot restore the clean, unmonitored access the defense would have had in October 2025. As in *Bundy*, a lesser sanction would "put the defense at a greater disadvantage than it would have faced had the government produced the *Brady* material in the first place." 968 F.3d at 1043.

**IV. The government's conduct rose to the level of interference with witnesses.**

In addition to the previously discussed conduct, on October 1, 2026, eight days after the defense motion, the government had an Oregon DOJ Senior AAG contact every one of the ODHS witnesses to find out which of them had been contacted by the defense. The government should be engaging in no such contact; while a motion accusing the government of interfering with defense access to these exact witnesses was pending, the government reached the entire witness pool through their employer's counsel to find out which of them had talked to the defense. This compounds the *Black* violation, because the witnesses now know the government is tracking whether they speak with the defense. Defense requests a complete record of the communications: AAG Babarsky's outgoing message, every response, and any other government contact with these witnesses since June 2026, as Gov't Ex. 7 is only the summary email.

The government discusses a "backdrop of another witness reporting confusion" about how witness investigators identified themselves in support for their need to clarify confusion with Ms. Reddy. ECF 162 at 30. The December 10, 2024, discussion between TFO Lee and Mr. Marc does not create a "backdrop" of confusion; instead, it should have made very clear to the government that defense investigator's had fully identified themselves to witnesses, since the government had received an audio recording made by Mr. Marc of his conversation with defense investigators, enclosed here as Defense Exhibit 2, where they immediately and fully identified themselves. This ten-month-old, second-hand incident involving unrelated people is not a compelling justification for telling a state employee that defense lawyers "play little shady games" and that "sometimes that's what they say."

The government does not contest that their statements to Ms. Reddy constituted improper statements to a witness but instead argue that the defense must show a witness is driven off the stand in order to establish a due process violation. The caselaw does not support that such an extreme showing is necessary for interference with a witness to have occurred. As articulated in *Vavages,* a defendant alleging interference with a witness must demonstrate "misconduct by a preponderance of the evidence." *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998). The Court does not articulate a requirement to show that such misconduct prevented a witness from testifying entirely.

The Court has defined what constitutes misconduct in *Black* and *Rich.* The Ninth Circuit made clear in *Rich* that government conduct "that has the *purpose or effect* of discouraging witnesses from cooperating with counsel of an accused" may constitute government misconduct. *United States v. Rich* 580 F.2d 929, 934 (9th Cir. 1978). The Court admonished that:

> Although the circumstances of this case cannot support a charge of denial of access to witnesses, we recognize that abuses can easily result when officials elect to inform potential witnesses of their right not to speak with defense counsel. An accused and his counsel have rights of access to potential witnesses that are no less than the accessibility to the potential prosecutors and their investigatory agents. It is imperative that prosecutors and other officials maintain a posture of strict neutrality when advising witnesses of their duties and rights. Their role as public servants and as protectors of the integrity of the judicial process permits nothing less.

*Id.*

In *Black*, the government maintained that neutrality because the prosecution merely advised witnesses that they had a right to decline a defendant's requested interview. *United States v. Black*, 767 F.2d 1334, 1337 (9th Cir. 1985). Such an admonition did not impair the defendant's access to the witnesses, which would otherwise have denied Mr. Black his fair trial.

Here, the government went far beyond neutrality, to a witness who is employed by ODHS and who presumably works with and speaks with many of the other ODHS witnesses in this case. Defense is not obligated to disclose its own investigative work product in order to establish a due process violation when the government has furnished a recording of non-neutral statements to witnesses central to its fraud allegations against the defendants. The statements themselves constitute the misconduct and should be sanctioned accordingly.

## V. Alternative Remedies

The government suggests no alternative, appropriate lesser sanction. The defense maintains that dismissal is appropriate. However, if the Court declines to dismiss the indictment, the defense suggests alternatively:

- A Jury Instruction: "In this case I have found that the prosecution interfered with defense access to witnesses and failed to disclose exculpatory information they were constitutionally obligated to provide. You shall hold this against the government when considering the weight of the evidence. You may, but are not required to, find this presumption sufficient on its own to find reasonable doubt in this case."
- An evidentiary hearing at which TFO Lee, AUSA Rodriguez, and Trial Attorney Hutson must address the recordings, their instructions to witnesses to hold off on information, the June 2026 discovery of the recordings, and the October 1, 2026, canvas of witnesses.
- Preclusion of the fourteen witnesses from the government's case-in-chief.
- A sworn certification from the prosecutors that all recordings, notes, and reports have been produced.

- And an order that the defense may contact ODHS witnesses directly, with a curative notice to the witnesses confirming that they are free to speak with the defense.

Dated: October 14, 2026.

*/s/ Peyton Lee*
Peyton Lee, OR SBN 164224

*/s/ Michael Benson*
Michael Benson, AK Bar No.1311070

*/s/ Fidel Cassino-DuCloux*
Fidel Cassino-DuCloux, GA SBN 40244